City of Monessen and Bituminous Insurance Companies, Petitioners *v.* Commonwealth of Pennsylvania, Workmen's Compensation Appeal Board, Dianne Galanoudis, Widow of Spiro Galanoudis, Police Pension Fund of the City of Monessen and School District of the City of Monessen, Respondents.

Argued March 2, 1978, before Judges WILKINSON, JR., MENCER and BLATT, sitting as a panel of three.

*George H. Thompson,* with him *Hirsch, Weise & Tillman,* for petitioners.

*Charles Skomski* and *Thomas Anton,* with them *James N. Diefenderfer,* for respondents.

Opinion by Judge Mencer, June 22, 1978:

The City of Monessen and its insurance carrier have appealed from a decision of the Workmen's Compensation Appeal Board that Spiro Galanoudis was an employee of the City at the time of his death and that the City was therefore obligated to pay workmen's compensation benefits to his widow. We affirm.

On October 19, 1973, Spiro Galanoudis, a regular policeman in the general employ of the City of Monessen, was killed when struck by a car while directing traffic following a football game sponsored by the School District of the City of Monessen (School District). Galanoudis was one of 12 policemen assigned to the stadium by the Monessen Patrolmen's Fund at the request of the School District.

The Monessen Patrolmen's Fund (Fund) is a voluntary association of policemen to which approxi-

mately half of the City's 21-man force belongs. The purpose of the Fund is to provide, at the request of private parties, the services of off-duty policemen at events where large crowds are anticipated, such as funerals, weddings, and athletic events. The party sponsoring the event is charged a specified sum for each patrolman requested, the total amount being paid to the Fund. At the end of each year, the money collected in this fashion is distributed equally to the members of the Fund. The members annually elect cochairmen who manage the administrative details and serve as officers in charge at the events to which men are assigned by the Fund.

Although the Fund has no official authorization to provide police services, the mayor of Monessen, the chief of police, and the police captain are aware of the arrangement. The policemen who participate in the Fund's activities are at all times dressed in full uniform, including a weapon and a City of Monessen badge. Police equipment, such as walkie-talkies and police cars, is routinely used. Duty rosters for Fund assignments are posted in the police station. A citizen wishing to request police services telephones the police station and is put in contact with one of the cochairmen of the Fund.

For approximately 20 years prior to the unfortunate accident in question, it had been the custom of the Fund to provide 10 or 12 men to serve at football games sponsored by the School District. Since the inception of this arrangement, many of the details of this assignment, such as the placement of men in the stadium, had become standardized. Prior to the start of each football season, the athletic director meets with the cochairmen of the Fund to discuss problems and possible changes from the previous year. Prior to each game, the athletic director specifies how many men will be needed.

Actual supervision of the policemen at the games is the responsibility of the cochairmen. Although the athletic director and other school officials from time to time direct the cochairmen's attention to specific problem areas, no direct control is exercised over the policemen assigned to deal with these problems.

The policemen assigned to the stadium always have walkie-talkies at their disposal and usually a police car. When necessary, citations are issued and arrests are made.

At the game on October 19, 1973, 12 policemen, over half of the entire Monessen police force, were on duty at the stadium. After the game, one of the cochairmen of the Fund instructed Galanoudis to go to an intersection and direct traffic out of the stadium and onto the public road. Galanoudis was standing in the public road directing traffic when he was struck and killed.

His widow filed a fatal claim petition against the City and the School District. The Fund was not made a party to the action.[1] Extensive testimony was taken by a referee, who held that Galanoudis had been an employee of the City at the time of his death. When the Workmen's Compensation Appeal Board affirmed, this appeal followed.

The basic facts as related above are not in dispute. What is disputed is whether or not these facts establish that the School District had such control over Galanoudis as to make it, rather than the City, Galanoudis' employer. In essence, the City is here contending that Galanoudis was a "borrowed employee" of the School District.

---

[1] The fatal claim petition also named the Police Pension Fund as a defendant, apparently in the mistaken belief that that association was equivalent to the Monessen Patrolmen's Fund.

> The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it.* (Emphasis in original.)

*Mature v. Angelo,* 373 Pa. 593, 595, 97 A.2d 59-60 (1953).

Here, there was no evidence that indicated that the School District had or exercised any control whatsoever over the *manner* in which the policemen performed their duties. At most, the athletic director specified the number of policemen desired, and he occasionally directed that policemen be stationed in particular areas. These directions did not constitute control over the *manner* in which the work was to be done and therefore do not indicate an employer-employee relationship. *Cf. Mature v. Angelo, supra,* 373 Pa. at 597, 97 A.2d at 61 (fact that person to whom a machine and its operator are supplied points out work to be done and place where it is to be performed does not militate against continuance of employer-employee relationship between operator and his original master).[2]

On the other hand, the undisputed facts lead almost inevitably to the conclusion that the City retained the right to control the policemen assigned to the football games. Duty assignments for the games were posted at the police station. Actual supervision was the responsibility of members of the police force who testified that they considered themselves to be subject to

---

[2] This case is therefore distinguishable from *Smakosz v. Beaver Falls,* 209 Pa. Superior Ct. 115, 224 A.2d 785 (1966), where the evidence disclosed that the college exercised extensive control over all aspects of the duties of the policemen which it had "borrowed" from the City.

the supervision of the mayor and the chief of police while engaged in Fund activities.[3]

Police officers who were members of the Fund and who testified before the referee uniformly stated that they considered themselves to be police officers acting in the line of duty while at Fund assignments. City equipment was utilized, and the officers wore their uniforms and badges and issued citations and made arrests where necessary. Finally, there is no doubt that the policemen on duty at the games were furthering the interests of the City in maintaining order, directing traffic, and otherwise enforcing the laws of the City and the Commonwealth.[4]

Under these circumstances, and in view of the fact that over half of the City's police force was on duty at the game in question, it is almost inconceivable that the City would not retain the authority to control the manner in which the policemen were exercising powers granted to them by the City itself. Indeed, the mayor, who personally testified that he was aware of the arrangement between the Fund and the School District, is charged by statute with the duty to "exercise a constant supervision and control over [the] conduct [of policemen]." The Third Class City Code, Act of June

[3] The City emphasizes that these men were in charge because of their positions as cochairmen of the Fund. At most, this fact would tend to indicate that the Fund was an employer of Galanoudis. Even if this were established, it would not necessarily aid the City, since an employee may well have two employers at the same time if he is subject to the control of both. *See, e.g., Girard Trust Corn Exchange Bank v. Philadelphia Transportation Co.,* 410 Pa. 530, 190 A.2d 293 (1963); *Hatter v. Lenox,* 206 Pa. Superior Ct. 263, 212 A.2d 916 (1965). While there is authority to allow the apportionment of the obligation to pay compensation between two coemployers, *Hatter v. Lenox, supra,* the Fund is not a party to these proceedings.

[4] Indeed, the police captain testified that prior to the creation of the Fund, on-duty policemen had been assigned to serve at similar events without extra compensation.

23, 1931, P.L. 932, §2007, *as amended,* 53 P.S. §37007. Since there is no reason to believe that the mayor has abdicated his authority and responsibility in this regard, we cannot find that the City did not have the right to control the conduct of Galanoudis on the night he was killed.[5]

The City also argues that the School District was a "statutory employer" of Galanoudis under Section 302(b) of The Pennsylvania Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §462. At the time of Galanoudis' death, Section 302(b) provided, *inter alia*:

> After December thirty-first, one thousand nine hundred and fifteen, an employer who permits the entry, upon premises occupied by him or under his control, of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the. employer's regular business entrusted to that employe or contractor, shall be conclusively presumed to have agreed to pay to such laborer or assistant compensation in accordance with the provisions of article three. . . .

This provision is clearly inapplicable to this case. Galanoudis was killed on a public street, not on premises occupied or controlled by the School District. Moreover, Galanoudis had been engaged to provide police services, and such services are not part of the School District's regular business.

Since the facts and the law support the determination of the Workmen's Compensation Appeal Board, we will affirm its order granting benefits.

---

[5] The fact that Galanoudis was being paid by the Fund rather than by the City is not, of course, determinative. *See, e.g., Martin Trucking Co. v. Workmen's Compensation Appeal Board,* 30 Pa. Commonwealth Ct. 367, 373 A.2d 1168 (1977), and note 3, *supra.*

ORDER

AND Now, this 22nd day of June, 1978, the appeal of the City of Monessen and Bituminous Insurance Companies is hereby dismissed, and the order of the Workmen's Compensation Appeal Board, dated March 17, 1977, is affirmed. Accordingly, it is ordered that judgment be entered in favor of Dianne Galanoudis, widow of Spiro Galanoudis, and against the City of Monessen and Bituminous Insurance Companies in the amount of $85.12 per week, beginning October 20, 1973 and continuing into the future, together with interest at the rate of 10 percent per annum on deferred payments of compensation from the date due to the date paid, all within the terms and limits of The Pennsylvania Workmen's Compensation Act.

In addition, the City of Monessen and Bituminous Insurance Companies are directed to reimburse the claimant for reasonable burial expense, in the amount of $750, and to pay to claimant's counsel, Charles Skomski, Esquire, the sum of $1,481.09.

The City of Monessen and Bituminous Insurance Companies are further directed to reimburse the Monessen School District and/or its insurance carrier, State Workmen's Insurance Fund, for compensation payments made to the claimant at the direction of the referee, with 10 percent interest from time of payment until June 17, 1976.