Lic CANOT and Kemely Canot, Husband and Wife, Appellants

v.

CITY OF EASTON.

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2011.
Decided Feb. 9, 2012.

Michael A. Snover, Bethlehem, for appellants.

Steven E. Hoffman, Allentown, for appellee.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

Lic and Kemely Canot (Canots) appeal from an order of the Court of Common Pleas of Northampton County (trial court), dated March 10, 2011. The trial court granted the City of Easton's (City) motion for summary judgment and denied the Canots' motion for partial summary judgment, determining that the City was entitled to immunity from civil liability pursuant to the exclusivity provisions of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708. For the reasons that follow, we affirm.

In June 2006, a flood occurred in Easton, Pennsylvania, which caused damage to the City's property. In response, the City entered into a National Emergency Grant Worksite Project Agreement (Agreement) with the Private Industry Council (PIC).[1] (Reproduced Record (R.R.) at 78–89.) Under the Agreement, PIC agreed to provide "participants" to assist City employees with flood-related clean-up duties for the period of August 15, 2006, to December 31, 2006. (*Id.* at 78.) In return, the City agreed to provide adequate direction and supervision for the PIC-provided workers, as follows:

VII. REPRESENTATIONS AND UNDERSTANDING:

The [City] agrees to operate this worksite in accordance with the provisions, conditions and specifications as follows:

1. To insure that participants assigned to this worksite will only perform tasks that are a result of the disaster or are necessary because of the destruction in this declared area.

2. To insure that PIC will be notified as soon as all tasks which are necessary as a direct result of the destruction have been completed.

3. To insure compliance with governing state and federal laws and policy.

4. To provide adequate supervision of the temporary participants.

5. To provide sufficient work to fully occupy the temporary participants' working hours.

6. To maintain the worksite timesheets and monitoring of hours and attendance.

7. To adhere to applicable wage and hour regulations.

8. To insure safe and sanitary working conditions.

9. To file injury reports when applicable and immediately advise PIC as the Workers' Compensation provider.

10. To insure that no temporary participant will be involved in any sectarian or political activities.

(*Id.* at 81.)

As required by the Agreement, the parties drafted a "job description"—dictated by criteria submitted by the City (*id.* at 60, 67, 73)—setting forth the PIC-provided workers' responsibilities, hours, rate of pay, etc. (*Id.* at 82–86.) The job description described the PIC-provided workers as "laborers," as defined by materials submitted by the City and attached to the job description, and provided that the PIC-provided workers were to work 40 hours per week, from 7:00 a.m. to 3:30 p.m., with an unpaid lunch break between 12:00 p.m. and 12:30 p.m., at a rate of $12.00 per hour. (*Id.* at 82.) The job description provided that PIC was to equip the PIC-provided workers with reasonable safety equipment, such as steel-tipped boots, glasses, and gloves, but that the City was to supply all operational equipment. (*Id.* at 83.) Finally, the job description identified "Carl Schumacher, Supervisor of Parks," as the PIC-provided workers' supervisor, and "Robert Rudd, Executive Director of Hugh Moore Park," as alternate supervisor. (*Id.* at 82)

Regarding the relationship between the City, PIC, and the PIC-provided workers, the Agreement provided, in pertinent part:

1. PIC is a nonprofit organization that receives state and federal funding to operate employment and training programs for individuals that meet specific program criteria. (R.R. at

57.) PIC received a federal National Emergency Grant (NEG) when Lehigh County and Northampton County were declared disaster areas following the June 2006 flood. (*Id.*)

H. RELATIONSHIP OF PARTIES:

The [City] does not become the agent of PIC for any purpose pursuant to this Agreement, and will make no representation of such. In agreeing to provide direction and supervision for the participant(s), the [City] understands that this does not make any participant an employee or agent of PIC, nor is PIC liable to the [City] or any third party by reason of any future act or failure to act by any participant on or off the job

(*Id.* at 80.)

Concerning the payment of wages and workers' compensation, the Agreement provided, in pertinent part:

A. PAYMENTS:

(1) The [City] will assist PIC by providing the appropriate documentation (signed timesheets) to PIC on a timely basis to ensure the participant is paid on a timely basis.

(2) All hours must be rounded to the nearest quarter hour on a daily basis.

. . . .

I. WORKERS' COMPENSATION:

PIC will provide Workers' Compensation coverage to all participants.

(*Id.* at 79–80.)

Mr. Canot was one of the workers sent by PIC to assist the City with flood cleanup. Mr. Canot's primary assignment was constructing and moving cabinets. (*Id.* at 122.) Mr. Canot contends that he was injured on November 17, 2006, while working in the parks department garage. Specifically, Mr. Canot alleges that he was in the process of moving a large metal cabinet when he slipped and fell on grease, or some other slippery substance, causing the cabinet to fall on top of him. (*Id.* at 12.) Mr. Canot subsequently sought and received workers' compensation benefits

from PIC. (*Id.* at 381–95.) The City did not participate in the workers' compensation proceedings.

On October 16, 2008, the Canots filed a complaint against the City with the trial court, asserting causes of action in negligence and loss of consortium arising out of the alleged slip and fall that occurred on November 17, 2006. On November 5, 2010, the City filed a motion for summary judgment and a brief in support thereof, asserting that the Canots' claims were barred by the exclusivity provisions of the Act, because Mr. Canot was a City employee at the time of the alleged incident under the "borrowed servant" doctrine. The Canots filed a response and a brief in opposition to the City's motion for summary judgment. The Canots also filed a motion for partial summary judgment and a brief in support thereof, asserting that the City was estopped from arguing that Mr. Canot was a City employee at the time of the alleged incident because the City knew of Mr. Canot's workers' compensation claim against PIC and acquiesced in PIC's admission that it was Mr. Canot's employer. The Canots also argued that the exclusivity provisions of the Act did not apply because, as a matter of law, PIC, not the City, was Mr. Canot's employer at the time of the alleged incident. The City filed a response and a brief in opposition to the Canots' motion for partial summary judgment. The Canots filed a reply brief.

In support of the parties' respective motions for summary judgment, the trial court received, *inter alia*, the deposition testimony of Mr. Canot; Carl Schumacher, the City's Supervisor of Parks; David Hopkins, the City's Director of Public Works; Michael D'Annibale, PIC's NEG administrator; and Victor Hernandez, PIC's NEG coordinator.

Mr. Canot testified that he became associated with PIC in 2006, and that his con-

tact person was Victor Hernandez. (*Id.* at 120.) Mr. Canot explained that PIC placed him with the City to assist in flood clean-up and that his primary assignment was assembling and moving cabinets. (*Id.* at 121.) Mr. Canot testified that PIC did not provide him with any training before placing him with the City; however, Mr. Canot explained that he has a technical degree and stated: "I could be a manager of [sic] high-rise building. I could do heating and AC type of work in the building. I could supervise technical employees in my area of expertise." (*Id.* at 119–20.) Mr. Canot stated that the City provided all of the tools necessary to complete his daily tasks, but that PIC provided him with gloves and safety goggles. (*Id.* at 120, 126.) Mr. Canot testified that Carl Schumacher would take attendance every morning and assign each PIC-provided worker to a particular area of the City's public works complex. (*Id.* at 121–22.) Mr. Canot explained that he would then receive further instructions from the supervisor of the City department to which he was assigned. (*Id.* at 122.) Mr. Canot testified that Mr. Hernandez would come to the worksite on occasion to insure that the PIC-provided workers were performing their work, but that Mr. Hernandez did not provide the work assignments. (*Id.* at 123.) On November 17, 2006, the date that the alleged slip and fall occurred, Mr. Canot explained that he received his work instructions from Mr. Schumacher and the supervisor of the City's Motor Vehicle Bureau. (*Id.* at 126.) Mr. Canot testified that he did not know whether someone from PIC came to the scene following the alleged incident, but that the "second in command" of the City's Motor Vehicle Bureau prepared an injury report. (*Id.* at 128–29.)

Carl Schumacher testified that he was the City's Supervisor of Parks at the time of the alleged incident. (*Id.* at 110.) Mr. Schumacher testified that he supervised the PIC-provided workers under the Agreement. (*Id.* at 110, 114.) As supervisor, Mr. Schumacher testified that he took attendance every morning, logged hours, and gave the PIC-provided workers their job assignments. (*Id.* at 112, 114.) Once assigned to a department within the City's public works complex, Mr. Schumacher explained that the PIC-provided workers would then receive further job instructions from the supervisor of the particular department to which they were assigned. (*Id.* at 114.) Mr. Schumacher testified that the PIC-provided workers were directed solely by City employees at the worksite, and that the City provided all of the tools necessary for the PIC-provided workers to complete their assigned tasks. (*Id.*) Finally, Mr. Schumacher testified that his contact in PIC was Victor Hernandez. (*Id.* at 112.) Mr. Schumacher explained that Mr. Hernandez would visit the worksite approximately once a week to collect time sheets and to make sure that the PIC-provided workers were completing their assigned tasks. (*Id.* at 112–13.)

David Hopkins testified that he was the City's Director of Public Works at the time of the alleged incident. (*Id.* at 42.) Mr. Hopkins testified that the City and PIC entered into the Agreement following the June 2006 flood, and that PIC agreed to provide temporary workers to assist in flood clean-up. (*Id.* at 45.) Mr. Hopkins explained that the City did not pay any money under the Agreement; instead, the NEG administered by PIC funded the PIC-provided workers. (*Id.* at 45, 47.) Mr. Hopkins stated that Mr. Schumacher was the PIC-provided workers' supervisor, and that Mr. Schumacher was responsible for giving the PIC-provided workers their job assignments. (*Id.* at 46–47.) Finally, Mr. Hopkins testified that the PIC-provided workers were considered "laborers,"

and that their assigned tasks did not require special training. (*Id.* at 46.)

Mr. D'Annibale testified that he was responsible for administering the NEG that PIC received following the June 2006 flood, which included "contact[ing] the municipalities that were interested in having projects done for them because of the flood, arranging the projects with them, [and] hiring staff on [PIC's] end to take on the day-to-day operations of the program." (*Id.* at 57.) Mr. D'Annibale explained that, per the Agreement, the City did not pay anything for the PIC-provided workers: PIC covered wages, meals, and travel expenses. (*Id.* at 58.) PIC also provided workers' compensation coverage. (*Id.*) Mr. D'Annibale testified that he assigned Victor Hernandez to coordinate execution of the Agreement on behalf of PIC, which included recruiting workers and determining their eligibility to participate in a NEG program under federal and state guidelines; orienting eligible workers into the NEG program; and overseeing the day-to-day operations of workers placed with the City. (*Id.*) Regarding supervision of the PIC-provided workers, Mr. D'Annibale testified: "[W]e did not supervise any of the [PIC-provided workers] directly. That was all done by the [City]. . . . [T]he [City] provided the work, the [City] provided the supervision of those [PIC-provided workers]." (*Id.*) Additionally, Mr. D'Annibale engaged in the following colloquy:

Q. In this particular case, who determined where Mr. Canot would be working on a day-to-day basis?

A. That would be decided by his supervisor with the [City], where they were going to be working at on those particular days.

Q. If a decision had to be made to relocate Mr. Canot from one flooded building to another flooded building for cleanup services, for instance, who would make that call?

A. His supervisor, the [City].

. . . .

Q. Let me ask you this question. If transportation had to be provided to different [City] worksites, who would provide that transportation?

A. [The City].

Q. Who would control the timing of breaks, lunch breaks, things of that nature throughout the workday?

A. [The City].

Q. And who would assign the particular day-to-day job duties or job tasks to the PIC participants?

A. [The City].

(*Id.* at 69.)

Finally, Victor Hernandez testified that he was the NEG coordinator of the Agreement between PIC and the City. (*Id.* at 93.) As NEG coordinator, Mr. Hernandez explained that his duties included determining worker eligibility to participate in a NEG program and overseeing the day-to-day operations of workers placed with the City. (*Id.* at 93–94.) Mr. Hernandez stated that PIC did not provide any training to the PIC-provided workers before placing them with the City, but that the City provided safety training. (*Id.* at 95.) Mr. Hernandez testified that he would visit the worksite approximately two to three times per week to ensure that the PIC-provided workers were performing flood-related work. (*Id.* at 94–95.) Mr. Hernandez explained that Carl Schumacher was the PIC-provided workers' main supervisor, and that the City's department supervisors provided additional supervision. (*Id.* at 95, 99.) Mr. Hernandez testified that the City was responsible for completing time and attendance sheets for each PIC-provided worker, and that he would collect the completed forms from Mr. Schumacher every

week to process them for payment. (*Id.* at 100–01.) With regard to employee discipline, Mr. Hernandez explained that PIC guidelines controlled, and that although the City could make recommendations, only PIC could actually discipline the PIC-provided workers. (*Id.* at 94, 102.) The following excerpt from Mr. Hernandez's deposition testimony summarizes his role as NEG coordinator:

Q. And once you chose these workers to go down to the [City] what, if anything, did you then do regarding these workers?

A. Once we assigned them to whatever worksite they were assigned to, my function was to go ensure they were working, check the area they might have been working, and definitely to make sure they were working based on the NEG grant guidelines, which was anything that had to do with the disaster. At that point, it was just the flood disaster. So they had to work flood-related damages.

Q. So, in some respect, you were supervising what they were doing?

A. No, no. I did not supervise them. I would check in on them. Their supervisors were the [City].

Q. But what if you went down and you saw that they were not doing grant-related functions?

A. Then I would let the [City] know you're not using them the appropriate way.

Q. And they would have to stop using them that way?

A. Exactly.

. . . .

Q. How much, if any, involvement did you have in, like, assigning them their work with the [City]?

A. My only assignment—I would assign them to the [City]. The [City] had a few worksites. The [City] would then assign whatever they needed to the actual worksites. . . .

. . . .

Q. Did you ever personally train Lic Canot?

A. No.

Q. Did you personally supervise Canot on a day-to-day basis?

A. No.

Q. Did Canot report to you when he arrived at the worksite every morning?

A. No.

Q. Did Canot report to you when he left the worksite?

A. No.

Q. Did Canot ever ask you any questions about how to perform his job?

A. No.

Q. Did you ever give Canot any job assignments?

A. No.

Q. Did you ever tell Canot when he could take breaks throughout the day or, for instance, eat his lunch?

A. No.

Q. Who filled out Canot's time sheet?

A. The supervisors that were assigned with him would fill it out. Mr. Schumacher would sign off on it and I would pick them up.

(*Id.* at 94, 97, 99–100.)

By order dated March 10, 2011, the trial court granted the City's motion for summary judgment and denied the Canots' motion for partial summary judgment, holding that the City was immune from civil liability under the exclusivity provisions of the Act, because the City was Mr. Canot's employer at the time of the alleged incident. In so holding, the trial court found that the City was not estopped from asserting that Mr. Canot was a City employee at the time of the alleged incident,

because the City did not participate in the workers' compensation proceedings between Mr. Canot and PIC. The trial court further found that, under the "borrowed servant" doctrine, the City was Mr. Canot's employer at the time of the alleged incident because the City had the right to control Mr. Canot's performance. This appeal followed.

On appeal,[2] the Canots argue that the trial court erred in holding that their civil cause of action was barred under the exclusivity provisions of the Act. Specifically, the Canots contend that the trial court erred in finding that the City was not estopped from asserting that Mr. Canot was a City employee at the time of the alleged incident. The Canots also contend that the trial court erred in finding that the City was Mr. Canot's employer at the time of the alleged incident under the "borrowed servant" doctrine.

Section 303(a) of the Act, 77 P.S. § 481(a), generally makes the Act the exclusive method for securing compensation for injuries sustained in the course of employment; therefore, an employee is barred, absent some exceptions, from bringing suit at common law against his *employer* for such injuries.[3] *Kincel v. Dep't of Transp.*, 867 A.2d 758, 761 (Pa. Cmwlth.2005). Accordingly, the critical question in this case is whether the City

was Mr. Canot's employer at the time of the alleged incident.

■ We address, first, the Canots argument that the City should be estopped from asserting that it was Mr. Canot's employer at the time of the alleged incident. The Canots contend, *inter alia,* that estoppel should apply because the City was aware of Mr. Canot's workers' compensation claim against PIC and acquiesced in PIC's admission that it was Mr. Canot's employer. We disagree.

Describing the doctrine of judicial estoppel in *Black v. Labor Ready, Inc.,* 995 A.2d 875, 878 (Pa.Super.2010), the Superior Court stated:

> Our Supreme Court has held that "[a]s a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." Accordingly, judicial estoppel is properly applied only if the court concludes the following: (1) that the appellant assumed an inconsistent position in an earlier action; and (2) that the appellant's contention was "successfully maintained" in that action.

(Citations omitted) (emphasis and alterations in original).

---

2. "Our scope of review on appeal from a grant of summary judgment is limited to a determination of whether the trial court committed an error of law or abused its discretion. Summary judgment is a question of law based upon findings of fact." *Wetzel v. City of Altoona,* 152 Pa.Cmwlth. 309, 618 A.2d 1219, 1221 n. 5 (1992) (citations omitted). "For courts to enter summary judgment, the record must demonstrate that no genuine issue of material fact exists after an examination of the record in a light most favorable to the non-moving party." *Bacon v. City of Chester,* 128 Pa.Cmwlth. 575, 564 A.2d 276, 277 (1989).

3. Section 303(a) of the Act provides, in pertinent part:

> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108.

In *Black,* a worker was sent by a temp agency to work in a factory where she was injured, prompting the worker to seek workers' compensation benefits from the factory. In its answer to the worker's claim petition, the factory denied being the employer, asserting that the worker was an employee of the temp agency. In a subsequent civil suit, the factory argued that it was entitled to immunity under the Act because the worker was an employee of the factory at the time of the alleged incident. Applying judicial estoppel, the Superior Court held that the factory was precluded from asserting that it was the employer for purposes of immunity under the Act because the factory had successfully denied being the employer in the previous workers' compensation proceedings. But unlike the factory in *Black,* the City did not participate in the workers' compensation proceedings between Mr. Canot and PIC. Accordingly, there is no record of the City previously denying that it was Mr. Canot's employer. Judicial estoppel, therefore, does not apply.

■ We address, next, the Canots' argument that the trial court erred in finding that the City was Mr. Canot's employer under the "borrowed servant" doctrine. The existence of an employer-employee relationship is a question of law based upon the facts of each case. *Red Line Express Co. v. Workmen's Comp. Appeal Bd. (Price),* 138 Pa.Cmwlth. 375, 588 A.2d 90, 93 (1991). Under the Act, the terms "employer" and "employee" are synonymous with master and servant, respectively. Sections 103 and 104 of the Act, 77 P.S. §§ 21–22. The "borrowed servant" doctrine stands for the proposition that "[o]ne who is in the general employ of one employer may be transferred to the service of another in such a manner that the employee becomes an employee of the second employer." *Id.* (citing *Mature v. Angelo,*

373 Pa. 593, 97 A.2d 59 (1953)). In *JFC Temps, Inc. v. Workmen's Compensation Appeal Board (Lindsay),* 545 Pa. 149, 153, 680 A.2d 862, 864 (1996) (citing *Mature* ), our Supreme Court explained:

> The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is *whether he passes under the latter's right to control with regard not only to the work to be done but also the manner of performing it.* The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised.

(Emphasis added).

■ Although the right to control the performance of the work is the most persuasive indication of the existence of an employer-employee relationship, other factors may be relevant. *Id.* at 156, 680 A.2d at 865. In *Mature,* 373 Pa. at 597, 97 A.2d at 61, our Supreme Court stated:

> Facts which indicate that the servant remains the employe of his original master are, among others, that the latter has the right to select the employe to be loaned and to discharge him at any time and send another in his place, that the lent servant has the skill of a technician or specialist which the performance of the work requires, that the hiring is at a rate by the day or hour, and that the employment is for no definite period.

The payment of wages, withholding of payroll deductions, and provision of workers' compensation coverage, may also be considered, but are not determinative factors. *See Supp v. Erie Ins. Exch.,* 330 Pa.Super. 542, 479 A.2d 1037, 1041 (1984).

Notwithstanding the above, the Canots argue that the "prime sponsor" test, not the "control" test, should be applied to determine whether Mr. Canot was a "bor-

rowed servant" of the City. In support of their argument, the Canots cite this Court's opinion in *Pennsylvania Manufacturers' Association Insurance Company v. Workmen's Compensation Appeal Board,* 52 Pa.Cmwlth. 588, 418 A.2d 780, 781 (1980). There, a worker was involved in an employment program run by York County (County) under the auspices of the Federal Comprehensive Employment and Training Act (CETA). Acting as the "prime sponsor" under CETA, the County assigned the worker to a project run by the Community Progress Council (Council), where the worker sustained an injury. *Id.* at 781. Thereafter, the worker sought workmen's compensation benefits from the County. Before the referee (which are now referred to as workers' compensation judges), the County joined the Council as an additional defendant, arguing that the Council was the worker's rightful employer. The referee disagreed, determining that the County was the worker's employer, and the Board affirmed. On further appeal, this Court rejected the "control" test in favor of the "prime sponsor" test and affirmed the Board. We reasoned:

> The County here emphasizes that the Council took charge of the training and supervision of claimant and of any disciplinary and firing responsibilities, and argues that the crucial factor in settling the issue is who has the right of controlling the manner of claimant's performance of his work. This Court has held many times that the most important factor in determining the existence of an employer-employee relationship is evidence of actual control or of the right to control the work to be done and the manner of its performance. However, in the determination of an employer-employee relationship, each case must be decided on its own facts. In the instant case, the federal government has provided the County with funds to be utilized by the County to pay for workmen's compensation coverage for persons employed under [federal] program. Under its contract with the Council, the only funds the County transferred to the Council were for administrative costs. The County received and retained control of all other amounts received under the [federal] program, including amounts designed for claimant's wages and for the payment of worker's compensation insurance premiums. Therefore, we cannot conclude that the Board erred as a matter of law in determining that the County was the claimant's employer at the time of his injury.

*Id.* at 781 (quotations and citations omitted).

■ Applying *Pennsylvania Manufacturers' Association,* the Canots argue that PIC, not the City, was Mr. Canot's employer because PIC received and retained control of all money received under the NEG and paid Mr. Canot's wages and workers' compensation benefits. In other words, the Canots maintain that PIC was Mr. Canot's employer because PIC was Mr. Canot's "prime sponsor." The Canots' reliance on *Pennsylvania Manufacturers' Association,* however, is misplaced.

In *Wetzel v. City of Altoona,* 152 Pa. Cmwlth. 309, 618 A.2d 1219 (1992), this Court limited the application of *Pennsylvania Manufacturers' Association,* determining that the "control" test was the proper avenue for determining the existence of an employer-employee relationship. Similar to *Pennsylvania Manufacturers' Association,* the worker in *Wetzel* was involved in an employment program funded by CETA, known as the Summer Youth Employment Program (SYEP). Acting as the SYEP administrator for Blair County, the Altoona Area School District (District) assigned the worker to a City of Altoona highway crew. A work

agreement between the District and the City of Altoona identified the City of Altoona as the employing agency. Under the agreement, the City of Altoona agreed to provide a safe and healthy work environment, jobs appropriate for youth, and adequate supervision. The worker was killed when a City of Altoona employee backed into him with a piece of earthmoving equipment. Thereafter, the worker, through his administratrix, brought a negligence action against, *inter alia,* the City of Altoona, the District, and Deere & Company (Deere), manufacturer of the earthmoving equipment. Both the City of Altoona and the District motioned for summary judgment, each arguing that they were immune from suit under the exclusivity provisions of the Act as the worker's employer. The trial court granted the City of Altoona's motion for summary judgment only, determining that the City of Altoona was the worker's employer. On appeal, Deere argued that the District was the worker's employer under *Pennsylvania Manufacturers' Association* because the District administered the SYEP, which included the payment of wages and the provision of workers' compensation coverage. Rejecting Deere's argument, this Court reasoned:

> [I]t is control of the work to be performed, and not control over funding, which best determines the existence of the employer/employee relationship. Our examination of the record here reveals that the City assigned, supervised and controlled the work performed by decedent. Moreover, the employment agreement between the City and the District clearly indicates that the City was the employing agency with full control and responsibility for the work site. The trial court correctly found that the

City determined the hours and location of the work. Similarly, the City established rules governing the use of hardhats and vests and safety requirements around the construction equipment. In sum, the facts confirm that the City had actual control over decedent's work and the manner of its performance.

*Wetzel,* 618 A.2d at 1223 (citations and quotations omitted). Accordingly, the "control" test is the proper standard for determining whether the City is Mr. Canot's employer under the "borrowed servant" doctrine.

■ Here, the undisputed facts of record demonstrate that the City controlled the work to be performed by the PIC-provided workers and the manner of its performance. The testimonies of Mr. Canot, Mr. Schumacher, Mr. Hopkins, Mr. D'Annibale, and Mr. Hernandez all confirm that the City was responsible for giving the PIC-provided workers their job assignments and for providing the PIC-provided workers with direction and supervision on a day-to-day basis. Specifically, Mr. Canot testified that he received his work instructions from Mr. Schumacher and the supervisor of the City's Motor Vehicle Bureau on the date of the alleged incident. (R.R. at 126.) Moreover, the Agreement between the City and PIC gives the City full responsibility and control over the worksite. (*Id.* at 81.) While we acknowledge that some of the factors described above lie in favor of finding that PIC was Mr. Canot's employer—such as the fact that PIC had the power to select, discipline, and terminate the PIC-provided workers, and that PIC paid the PIC-provided workers' wages and provided workers' compensation coverage—just as many factors warrant the opposite conclusion.[4]

---

4. We reject the Canots' argument that Mr. Canot was a skilled worker. Although Mr.

Canot may hold technical expertise, that ex-

For instance, it was the City that dictated the PIC-provided workers' hours, and it was the City that supplied all of the tools necessary for the PIC-provided workers to complete their assigned tasks. Even if we were to find that more factors weighed against the City, however, we reiterate that "the right to control the performance of the work is the overriding factor." *JFC Temps*, 545 Pa. at 156, 680 A.2d at 865.

Accordingly, we affirm the trial court's decision.

### ORDER

AND NOW, this 9th day of February, 2012, the order of the Court of Common Pleas of Northampton County (trial court), dated March 10, 2011, is hereby AFFIRMED.

pertise was not required to complete his as-    signed tasks for the City.