**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-1352
_____

MICHAEL TRENTLY; AMY TRENTLY, his wife,

Appellants

v.

UNITED STATES OF AMERICA; CITY OF SCRANTON
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3:19-cv-01836)
District Judge:  Honorable Karoline Mehalchick
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 17, 2026

Before:  MATEY, MONTGOMERY-REEVES, and NYGAARD, *Circuit Judges*

(Opinion filed: June 23, 2026)
_____

OPINION*
_____

PER CURIAM

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Michael and Amy Trently appeal from the District Court's entry of summary judgment against them on their claims against the United States under the Federal Tort Claims Act ("FTCA"). We will vacate and remand for further proceedings.[1]

## I.

Trently was employed as a parole agent by the Pennsylvania Board of Probation and Parole ("the Board"). While so employed, he also served as a Special Deputy United States Marshal for the United States Marshals Service ("USMS"). He did so pursuant to a Memorandum of Understanding between the Board and the USMS that allowed Board employees to serve on a task force directed and coordinated by the USMS. The primary purpose of the task force was to investigate and arrest state and federal fugitives.

This case concerns injuries that Trently sustained on March 16, 2015, while he and other members of the task force were in the process of arresting a fugitive named Weitz. That morning, Trently intended to execute a warrant that the Board had obtained for Weitz's arrest. He contacted for assistance another member of the task force, Scranton police officer Hegedus. But Hegedus told Trently that the task force already had adopted and was prepared to execute a different arrest warrant for Weitz, one issued by the police department of Duryea, Pennsylvania. Thus, Trently decided to join Hegedus and other task-force members in executing the Duryea warrant. Trently and two other task-force

---

[1] Amy Trently's claims are based on injuries sustained by Michael Trently. Thus, although Amy Trently was a party in the District Court and is a party on appeal, for ease of discussion we refer hereafter only to Michael Trently and do so as "Trently."

members rode in a car driven by Hegedus as the task force first went to the Duryea Police Department for information and then went to stake out Weitz's suspected location. When Hegedus spotted Weitz leaving a building and approaching Weitz's car, Hegedus drove toward Weitz. As Hegedus's car approached Weitz's, Trently opened his door but the door collided with Weitz's car and then struck and injured Trently. Trently successfully sought workers' compensation benefits for his injuries from the Board.

Trently also filed suit in Pennsylvania state court against Hegedus and the City of Scranton alleging that Hegedus's negligent driving caused his injuries. The United States (the "Government") substituted itself for Hegedus as a defendant under the FTCA, removed the matter to federal court, and filed a motion to dismiss for lack of FTCA exhaustion, which the District Court granted.

Trently later exhausted his FTCA remedies and then filed the suit at issue here against the Government and the City of Scranton. Both moved to dismiss the complaint. The District Court granted Scranton's motion on the ground that the Government was the only proper party under the FTCA, and Trently does not appeal that ruling. For its part, the Government sought dismissal on the ground that it was immune from tort liability because a private party in its position would be immune under the Pennsylvania Workers' Compensation Act, 77 Pa. Stat. § 481(a).[2] In particular, the Government argued that it

---

[2] This statute provides: "The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to

was an "employer" under § 481(a) because Trently was injured during a task-force operation and should be deemed an employee of the USMS under the "borrowed servant" or "borrowed employee" doctrine. The court denied the Government's motion because Trently's complaint did not reveal the extent to which the USMS controlled his conduct.

Following discovery, the Government filed a motion to dismiss or for summary judgment in which it again argued that it was immune from liability under § 481(a) and the borrowed-servant doctrine.[3] The court agreed and granted the Government summary judgment on that basis. Trently timely sought reconsideration, which the court denied, and he now appeals.[4]

## II.

The District Court entered judgment for the Government on the sole ground that it was immune under § 481(a) because, when Trently was injured, the USMS was his employer for that purpose under the borrowed-servant doctrine. While many factors can

---

damages in any action at law or otherwise on account of any injury or death as defined in [77 Pa. Stat. § 411(a) and (2)] or occupational disease as defined in [77 Pa. Stat. § 27.1]."

[3] The Government also argued that it was entitled to judgment under the FTCA's "discretionary function" exception and because Trently was responsible for his own injuries. The District Court did not reach these issues, and nothing in this opinion prevents it from doing so on remand.

[4] We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment. *See Nunez v. Wolf*, 117 F.4th 137, 145 (3d Cir. 2024). In doing so, we view the facts and all reasonable inferences therefrom in favor of the non-moving party, and we will affirm only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See id.*

4

be relevant in applying the borrowed-servant doctrine, the ultimate test is whether the putative borrowing employer had "the right of control with regard not only to the work to be done but also to the manner of performing it." *JFC Temps, Inc. v. Workmen's Comp. Appeal Bd.*, 680 A.2d 862, 864 (Pa. 1996). "When different inferences can fairly be drawn from the evidence as to who is the controlling master of the borrowed employee at the time of the commission of the negligent act, it is for the jury, not the court, to determine the question of agency." *McConnell v. Williams*, 65 A.2d 243, 245-46 (Pa. 1949). Such is the case here.

In concluding otherwise, the District Court relied primarily on the facts that: (1) the Memorandum of Understanding ("MOU") between the Board and the USMS gave the USMS responsibility for "[d]irection and coordination" of the task force; (2) Trently took an oath of office agreeing to "execute all lawful orders" issued by the USMS; (3) the USMS has established Standard Operating Procedures ("SOPs") governing task-force operations; (4) Trently was required to follow the SOPs and the commands of the task force "supervisor/coordinator," Deputy United States Marshal Joseph Brozowski, during task-force operations; and (5) Trently was engaged in a task-force operation when he was injured because he reported that day to the United States Courthouse to meet up with other task-force members to execute the Duryea warrant that the task force adopted rather than the Board warrant that Trently already had.[5]

---

[5] The court relied on other factors too, including that the USMS issued Trently a badge

These facts do indeed show that Trently was engaged in a task-force operation when he was injured and that the USMS exercised some control over that operation. But as Trently argues, countervailing evidence permits the reasonable inference that the Board exercised substantial control over his conduct during the operation too. For example, the terms of Trently's special deputization accompanying his oath of office provided that his appointment "does not constitute employment" by the USMS. And although the MOU provides that the USMS was responsible for the "[d]irection and coordination" of the task force generally, the same section provides that "each [member] agency [such as the Board] retains responsibility for the conduct of its personnel."

The District Court dismissed this evidence as consisting of the kind of labels and characterizations that do not control the borrowed-servant inquiry. *See Burrell v. Streamlight, Inc.*, 222 A.3d 1137, 1142 (Pa. Super. Ct. 2019) (collecting cases). That might be true considering this evidence in isolation. But as Trently argues, he submitted other evidence bearing those characterizations out—i.e., evidence that the Board, rather than the USMS, had the right to control and indeed did control his operations in the field even during task-force operations. For example, Trently stated in his declaration that the Board retained the right to remove him from task-force operations and in fact did so on occasion. He also stated in his declaration that it was the Board, and not the USMS, that

_____

(though Trently testified that the USMS did so only after the incident in question) and that Trently agreed to comply with USMS computer protocols (though the incident in question does not appear to have involved the use of a computer).

6

provided all of his training and essential equipment, including his firearm.  Various

Board documents also required Trently to comply with Board rules and policies. So did

the MOU, which provides that all members of the task force "shall comply with their

[parent] agency's guidelines concerning the use of firearms, deadly force, and less-lethal

devices."  And the USMS's own SOPs are replete with provisions requiring Trently to

comply with the Board's policies during task-force operations and otherwise suggesting

that the Board maintained substantial control over him during those operations, including

provisions requiring Trently to wear his Board uniform and use his Board equipment.[6]

---

[6] *See* SOP § III.B.7 (providing that special deputy USMSs generally "are responsible for adhering to the rules, regulations, and policies of their parent agencies"); § III.D.4 (providing that special USMS deputies "will comply with their parent agency policies, procedures, and codes of conduct" except as to USMS property and that issuance of any USMS weapon requires confirmation of "the parent agency . . . that the weapon is approved for use by the parent agency"); § III.D.5 (requiring that any task force-related travel outside the special deputies' jurisdiction be "approved by their parent agency"); § IV.A.1.c (providing that special deputies "should wear their parent agency approved equipment with identifies them as members of that agency" and "should not be issued USMS raid jackets"); § IV.A.1.n (providing that special deputies "operating vehicles assigned to them by their parent agencies will adhere to their agency policy on vehicle pursuits"); § IV.E.8 (requiring special deputies to "complete reports on state and local investigations consistent with each of their agencies' requirements"); § IV.F.3 (providing that special deputies "shall utilize their parent agencies' authorized equipment while assigned to USMS Enforcement Operations"); § IV.G.1 (providing that "[a]ll members assigned to USMS Enforcement Operations shall comply with their parent agencies' guidelines concerning the use of firearms and deadly force"); § IV.G.4.d (providing that the parent agency, and not the USMS, conducts any internal investigation regarding a special deputy's conduct).  Consistent with these provisions, Trently testified that he used his Board-issued handcuffs when arresting the fugitive in this case.

Thus, while Trently acknowledged at his deposition that he was required to follow the USMS's SOPs during task force operations, he specified that he was required to do so only when they did not conflict with the policies of the Board and that, when the policies conflicted, the Board's policies controlled. And Trently also testified to a specific example of a time when Board policies required him to refuse a direct order from Brozowski during a task-force operation and Brozowski acquiesced.[7] In sum, the record contains ample evidence suggesting that the Board retained the right to assert substantial control over Trently during task-force operations. That evidence makes summary judgment on the borrowed-servant issue inappropriate.[8]

---

[7] This incident concerned Brozowski's order that Trently use a USMS riot shield to serve as the "entry man" during an operation. Trently testified that he followed one such order by Brozowski but, when Trently's Board supervisor saw reference to that fact in Trently's report, his Board supervisor told him "you're not allowed to touch anything you weren't trained on or that isn't issued to you by the State Parole Board. So don't do that again." When Brozowski later gave Trently the same order during a different operation, Trently said "no, I can't. I was told by my supervisors I can't and [Brozowski] said that was it. There was no argument."

[8] *See, e.g.*, *Gardner v. MIA Prods. Co.*, 189 A.3d 441, 445-47 (Pa. Super. Ct. 2016) (holding that similarly conflicting evidence on the issue of control precluded summary judgment); *Shamis v. Moon*, 81 A.3d 962, 972-73 (Pa. Super. Ct. 2013) (same); *see also* *Williams v. Delta Truck Body Co.*, 892 F.2d 327, 330-31 (3d Cir. 1989) (reversing summary judgment ruling that an employee was a borrowed servant under Pennsylvania law in light of a factual dispute regarding which employer provided specialized training); *City of Monessen v. Workmen's Comp. Appeal Bd.*, 387 A.2d 1000, 1002-03 (Pa. Commw. Ct. 1978) (holding that off-duty police officer remained an employee of a city while directing traffic for a school district where the city retained control over officers during that work, officers used city equipment and wore their city uniforms and badges, and the officers' work for the school district furthered the interests of the city too); *cf. Canot v. City of Easton*, 37 A.3d 53, 63-64 (Pa. Commw. Ct. 2012) (affirming summary

## III.

For these reasons, we will vacate the District Court's entry of summary judgment and will remand for further proceedings. [9]

---

judgment ruling that a second employer borrowed an employee from the first employer where the second employer "supplied all of the tools necessary" for the work and the employers' agreement gave the second employer "full responsibility and control" over the worksite); *Garden City v. Herrera*, 766 S.E.2d 150, 153 (Ga. Ct. App. 2014) (holding that a multijurisdictional task force borrowed a police officer from a city where, under a task-force agreement, the city "relinquish[ed] all command and directive authority" over the officer and gave "complete control and direction" over the officer to the task force, and where the officer was following an instruction by the task-force supervisor that "the City had no authority to countermand"). We note that neither the District Court nor the parties have addressed whether both the Board *and* the USMS could be deemed Trently's employers for § 481(a) purposes. *See, e.g.*, *Nagle v. TrueBlue, Inc.*, 148 A.3d 946, 952-53, 956-61 (Pa. Commw. Ct. 2016). We thus do not address that issue either.

[9] Judge Matey would affirm the District Court's order granting summary judgment for the United States. Under the borrowed-servant doctrine, courts analyze "who is the controlling master . . . at the time of the negligent act." *McConnell v. Williams*, 65 A.2d 243, 245–46 (Pa. 1949); *see also Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (analyzing who had control of employee "when he was injured"). Here there is no dispute that USMS exercised substantial control over Trently during the specific operation relating to the cause of action. And since "[a] person may be the servant of two masters, . . . at one time as to one act, provided that the services to one does not involve abandonment of the service to the other," *McConnell*, 65 A.2d at 245; *see also Tyson v. Litwin Corp.*, 826 F.2d 1255, 1258 (3d Cir. 1987), the general MOU with the USMS does not show Trently's services to USMS on this occasion arose from his state employment.

9