J-A32009-17

2018 PA Super 139

ERIC GARDNER : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
    Appellant :
:
:
:
    v. :
:
:
:
MIA PRODUCTS COMPANY, DONETTA : No. 517 MDA 2017
FOODS, INC., AND J & J SNACK :
FOODS CORP/MIA :

Appeal from the Order Entered February 27, 2017
In the Court of Common Pleas of Lackawanna County
Civil Division at No(s): 11-CV-1560

BEFORE: OTT, J., DUBOW, J., and STRASSBURGER*, J.

OPINION BY OTT, J.: **FILED MAY 30, 2018**

Eric Gardner appeals from the order entered in the Court of Common

Pleas of Lackawanna County, on February 27, 2017, granting summary

judgment in favor of MIA Products Company and J & J Snack Foods Corp./MIA

(MIA).[1] The trial court determined that Gardner was a borrowed servant of

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Donetta Foods, Inc. is not a party to the case. Although named in the complaint, Gardner determined Donetta was not a proper party and never served it. The statute of limitations on this matter has expired, and no action survives against Donetta. A Rule to Show Cause was issued in the matter, requiring Gardner to explain why the order granting summary judgment was not to be considered interlocutory. Gardner responded explaining Donetta was not a proper party, had never been served, the statute of limitations had expired prior to the grant of summary judgment, and there was no dispute amongst the parties that no case against Donetta Foods, Inc. existed. **See** Gardner Response to Rule to Show Cause, 5/4/2017. The Rule to Show Cause

MIA and, therefore, not entitled to file a tort claim against the company for injuries allegedly suffered while working there. In this timely appeal, Gardner raises two claims. First, he argues the trial should not have looked beyond the fact that he was not a statutory employee of MIA. Second, Gardner argues the trial court erred in concluding he was borrowed employee of MIA.[2] After a thorough review of the submissions by the parties, relevant law, and the certified record, we agree that there are open issues of fact that prevent the proper grant of summary judgment. Accordingly, we reverse the order granting summary judgment and remand for trial.

Our standard of review of an order granting summary judgment is as follows:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

_____

was accordingly discharged. **See** Order, 5/11/2017. At argument, all parties agreed that no cause of action existed against Donetta Foods, Inc. It is apparent that no cause of action can be revived against Donetta Foods, Inc. Accordingly, the order granting summary judgment in this matter is a final and appealable order, having disposed of all claims against all parties.

[2] Gardner actually broke this issue into two parts. He claims there remains open issues of fact as to who controlled his work, and that the trial court otherwise erred in finding he was a borrowed employee. Because these issues are part of the same overriding question, we will address them together.

***Good v. Frankie & Eddie's Hanover Inn, LLP***, 171 A.3d 792, 795 (Pa. Super. 2017) (citation omitted).

Many of the underlying facts in this matter are not in dispute. Gardner was an employee of DelVal Staffing (DelVal), a temporary employment agency. Gardner was assigned to work at MIA as a freezer/packer. His work consisted of taking food items from a walk-in freezer to be packed for shipment. While performing these tasks, Gardner fell on a slippery spot in or near the freezer. He received workers' compensation benefits from DelVal, and then filed a complaint alleging negligence against MIA. Following discovery, MIA moved for summary judgment, claiming Gardner was a "borrowed employee" and was, therefore, ineligible to file a tort action pursuant to the Workers' Compensation Act (WCA), 77 P.S. § 481(a). What is currently in dispute is the determination of who was Gardner's employer – solely DelVal or DelVal and MIA.

Gardner's first claim is that because MIA was not his statutory employer, he is not limited to collecting workers' compensation benefits as the sole remedy for his injuries. This argument is not on point, as the trial court did not base the grant of summary judgment on whether MIA was Gardner's statutory employer. Indeed, by our review, MIA never claimed to have been Gardner's statutory employer. Rather, MIA's motion for summary judgment was based on his assertion that Gardner was a borrowed employee, not a statutory employee.

Indeed, there are differences between being a statutory and borrowed employee. *See Shamis v. Moon*, 91 A.3d 962, 969-70 (Pa. Super. 2013). Essentially, the borrowed employee (servant) doctrine is simply an outgrowth of common law, with common law factors that are required to be met to entitle one to the protection of the WCA. There are separate, statutory, requirements that must be met to satisfy the definition of a statutory employee. The differences between the two are immaterial to the resolution of this matter, as MIA never claimed to be a statutory employer. However, despite different requirements, both borrowed and statutory employees are entitled to the benefits and limitations of the Workers' Compensation Act. *Id*.

Next, we examine the question of whether the trial court correctly determined Gardner was a borrowed employee of MIA.

> The law governing the "borrowed" employee is well-established. The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. *Hamler v. Waldron*, 445 Pa. 262, 265, 284 A.2d 725, 726 (1971); *Mature v. Angelo*, 373 Pa. 593, 595, 97 A.2d 59, 60 (1953). The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. *Mature*, 373 Pa. at 596, 97 A.2d at 60. Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. *Id.* at 597, 97 A.2d at 60. The payment of wages may be considered, but is not a determinative factor. *Venezia v. Philadelphia Electric Company*, 317 Pa. 557, 177 A. 25 (1935). Although the examination of these factors guides the determination, each case must be decided on its own facts. *Daily Express, Inc. v. Workmen's Compensation Appeal Board*, 46 Pa. Commw. 434, 406 A.2d 600 (1979).

*JFC Temps, Inc. v. WCAB (Lindsay)*, 680 A.2d 862, 864 (Pa. 1996).

Pursuant to our standard of review, we are required to examine the facts in the light most favorable to the non-moving party, Gardner. In determining that MIA was Gardner's employer, the trial court reasoned as follows:

> A careful application of the above standards[3] to the facts in this case reveals that, regardless of DelVal Staffing's right to control, [MIA] had the clear right to control [Gardner] as an employee.

Trial Court Opinion, 2/27/2017 at 5.

This statement is unaccompanied by citation to the record. However, the trial court continued:

> In terms of performance of the actual work, [Gardner] was directed by [MIA]. (*See generally*, Exhibit "A", pp. 98, 107-109.) [MIA] directed [Gardner] as to which product he would be stacking and placing on pallets. [MIA] also directed [Gardner] as to how to place different sizes of boxes on the pallets and how high to operate the "cage door" of the elevator. One of [MIA's] supervisors was always present with [Gardner] while he was working in the freezer, and, by [Gardner's] own admission, that supervisor would tell [Gardner] "what to do and when to do it," including setting [Gardner's] break schedule.

*Id.* at 5-6.

If this were the only testimony regarding Gardner's work experience at MIA, it would likely suffice to show MIA exercised control over Gardner, rendering him a borrowed employee. However, read in totality, and in the

---

[3] Here, the trial court referred specifically to the standards announced in *JFC v. WCAB*, *supra*.

light most favorable to Gardner as the non-moving party, as we are required to do, Gardner's testimony is not clear on the issue of control.

Initially, there is no question that DelVal Staffing operated as an employer of Gardner. If nothing else, DelVal provided Gardner his workers' compensation benefits.[4] Gardner's deposition testimony also shows DelVal instructed Gardner about the type of work he would be performing at MIA, rules regarding apparel, and general safety. *See* Gardner Deposition, 12/29/2014 at 83-85. DelVal provided transportation to MIA, including a DelVal supervisor for every vanload of employees. *Id.* at 87-89. The DelVal supervisor told each employee where he or she would be working that day. *Id.* at 90. The DelVal supervisor was available to any DelVal staffer the entire workday and they conducted walk-throughs throughout the workday. *Id.* at 91-92.

Gardner testified to the following:

Q: So your very first day of working, you get in the van, you're taken up to MIA. Can you just walk me into the building and tell me what you did during that first day, how you were greeted, what instructions you may have gotten, et cetera?

---

[4] Interestingly, the trial court relied on ***English v. Lehigh County Authority***, 428 A.2d 1343 (Pa. Super. 1981), to support its conclusion that Gardner was a borrowed employee of MIA at the time of injury. ***English*** implies, however, there can be only one employer. *Id*. at 1346, n. 1 ("As a practical matter, however, this is of no significance [referring to Kelly Labor's appeal], for in deciding the appeals by English's administrator and Weisenberger from the orders granting summary judgment in favor of the Authority, we shall necessarily decide whether the Authority or Kelly Labor was English's employer.")

A: Taken up into the break room.  We were told [] where to put our personal stuff.  We were given, I believe, hair nets, gloves. I'm not sure if we had earplugs or not. But I believe we had to wear white coats in the packing area.  Told us where the freezer seats [suits] were located, that we had to wear one in the freezer. Was also told that there wasn't enough for everybody, so as one – one employee is coming out of the freezer, you take their suit, put it on, and you go into the freezer.  It was constantly switching freezer suits with anybody.

Q: Who told you where to put your personal stuff?

A: DelVal supervisor.

Q: Who gave you the clothing?

A: DelVal Staffing supervisor handed it out.

Q: Was there anyone from MIA present in the break room when they were telling you these things?

A: I believe so.

Q: Was there anyone from MIA instructing you on things while you were in the break room on your first day on occasion of your first arrival?

A: I don't recall.

*Id*. at 94-95.

Further:

Q: So that first day when you were taken to packing, what happened next?

A: We were told to watch how it was done.

Q: Who is telling you this?

A: DelVal Staffing supervisor.  They'll watch how things were done.  And then we were given the opportunity to try it.  If you didn't succeed in this part of packing, you went to another part of packing a different product.

\*\*\*

Q: When you were taken to the freezer section for the first time, what happened there?

A: We were told about the spot that constantly ices over.

Q: By whom were you told that?

A: The supervisor.

Q: From?

A: MIA and DelVal.

Q: Do you know who the MIA supervisor was?

A: No.

Q: What else were you told?

A: We were told which way the product comes into the freezer, which product you'll be stacking or palletizing. We were shown how to palletize each type of box they had, how many levels we're supposed to have on pallets, how to use the elevator, [how] to close and open the caged – the caged-in door of the elevator. I believe that was it.

Q: Was there also a demonstration where you were shown how to do all that?

A: Yes.

Q: Who did that?

A: They were actually MIA employees who were showing us how to palletize.

*Id.* at 96-98. After this exchange, Gardner testified, as quoted by the trial court, regarding the MIA supervisor explaining "what to do and how to do it." Trial Court Opinion, 2/27/2017 at 6.

While there was evidence to support the trial court's conclusion that MIA was afforded the right to control the DelVal workers, we do not believe that evidence is so compelling as to resolve all questions of material fact regarding the issue of worker control. Therefore, the evidence as currently constituted cannot justify the grant of summary judgment in favor of MIA. Gardner testified that it was a DelVal supervisor who evaluated them and placed them within MIA. The DelVal supervisors were present when MIA *employees* demonstrated how the work was performed. While MIA supervisors confirmed the employee demonstration accurately depicted how the work was to be performed, it is not clear whether Gardner and his DelVal compatriots were under the control of the MIA supervisors at the time. We cannot say that if the MIA supervisors were merely confirming what had been learned under DelVal supervision that, as a matter of law, control of Gardner had shifted to MIA.[5]

---

[5] In its motion for summary judgment, MIA also argued that DelVal's workers' compensation policy listed MIA as an "alternate employer" under the policy, thereby acknowledging MIA had the right to control the DelVal workers. **See** MIA Motion for Summary Judgment at ¶¶ 14-15. Because the trial court did not base its ruling on this argument, this issue has not been fully briefed by the parties. While we are allowed to affirm the judgment of the trial court based upon any valid basis of record (**see Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.**, 106 A.3d 27, 41 n. 15 (Pa. 2014) (appellate court may *affirm* for any reason appearing as of record)), we will not attempt to interpret the language of the policy and we take no position on the validity of MIA's policy interpretation.

The evidence presented may well allow for a finding in MIA's favor, but it does not necessarily compel that outcome. As such, the trial court abused its discretion in granting summary judgment in favor of MIA.

Judgment reversed. This matter is remanded for trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/30/18