J-A13044-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BARBARA WENNINGER AND JOHN WENNINGER, H/W, | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : | |
| HTSS, INC. AND MICHAEL KRAMER, | : : | |
| Appellees | : : | No. 2786 EDA 2019 |

Appeal from the Order Entered September 16, 2019
in the Court of Common Pleas of Bucks County
Civil Division at No(s): No. 2017-02690

BEFORE:  BENDER, P.J.E., LAZARUS, J. and STRASSBURGER, J.*

MEMORANDUM BY BENDER, P.J.E.:                **FILED: APRIL 5, 2021**

Barbara and John Wenninger appeal from the September 16, 2019 order granting summary judgment in favor of HTSS, Inc. (HTSS) and Michael Kramer (collectively, Defendants).[1] Upon review, we vacate the trial court's grant of summary judgment in favor of Defendants and against the Wenningers and remand to the trial court for further proceedings.

We glean the following from the record. On July 7, 2015, Wenninger, a human resources coordinator employed by Ryder Truck Rental and Maintenance Services (Ryder), fell on a wet bathroom floor while she was at work. According to Wenninger, there were no indications from the hallway

_____

[1] References to Wenninger in this memorandum refer to Barbara, but references to the Wenningers refer to both Barbara and John. John brought a loss of consortium claim against Defendants, but was not involved in the incident at issue.

_____

* Retired Senior Judge assigned to the Superior Court.

outside the bathroom that the floor was wet. When she swung the bathroom door open, she took one step inside and immediately fell on the wet bathroom floor. She sustained injuries to her hip, shoulder, and back, and underwent a total hip replacement.

The floor had recently been mopped by Michael Kramer, a temporary worker assigned to Ryder by HTSS, a staffing services agency. In 2015, Ryder had stopped hiring employees in anticipation of closing the facility and arranged for the services of temporary workers employed by HTSS instead. As a human resources manager, part of Wenninger's job at Ryder included hiring these temporary workers through HTSS. Ryder and HTSS negotiated the rates Ryder would be billed, from which HTSS would pay the temporary workers' hourly wages. HTSS and Ryder had no written contract regarding this arrangement.

After Wenninger requested that HTSS provide Ryder a temporary employee to perform cleaning tasks, HTSS hired Kramer and assigned him to work at Ryder beginning in late June 2015. At Ryder, Kramer filled out a weekly timesheet, which he submitted to Wenninger. She faxed it to HTSS so that HTSS could pay Kramer for the hours he worked at Ryder. HTSS retained responsibility for paying Kramer's wages, workers' compensation benefits, and taxes related to his employment. If Kramer was unable to report to work at Ryder due to sickness or another unexpected reason, he was supposed to contact HTSS. HTSS selected the temporary workers for a

given job based on the scope of the job requested by Ryder. HTSS retained the right to terminate a worker's employment, but Ryder could unilaterally request removal of the worker from the assignment.

On his first day of work, Ryder provided Kramer with a safety vest and safety glasses, and directed him to purchase safety boots, for which Ryder would reimburse him up to $50. According to Wenninger, Ryder's general maintenance manager, Mark Tenaglia, "would direct [Kramer] as to what [Ryder] needed to have accomplished." Motion for Summary Judgment, 4/2/2019, at Exhibit C (Wenninger Deposition, 6/7/2018, at 27). Tenaglia was a "task person" who "would show [Kramer] this is what we need to do. This is why you are here." *Id.* Kramer recalls that he met with someone in the office who introduced him to a Ryder employee named Jose, who was to train him. *Id.* at Exhibit F (Kramer Deposition, 6/7/2018, at 21-23). Jose spoke "broken" English, but Kramer got the gist of what Jose was saying, which was "[h]ere's how you perform these acts. Here's how you do it. So it was kind of a monkey see, monkey do to replicate what he did." *Id.* at Exhibit F (Kramer Deposition, 6/7/2018, at 24). Jose showed him how to perform his assigned tasks, which were all custodial in nature: cleaning windows, emptying trash cans, mopping the floors of Ryder's five bathrooms, and sweeping the warehouse floor. *Id.* at Exhibit F (Kramer Deposition, 6/7/2018, at 24, 28). Ryder provided Kramer a list of tasks to complete daily, but Kramer decided the order in which he completed the

tasks. ***Id.*** at Exhibit F (Kramer Deposition, 6/7/2018, at 30-33, 84). Kramer never discussed the tasks with HTSS. ***Id.***

When it came to the bathrooms, Kramer typically began by emptying the trash, cleaning mirrors and toilets, and filling soap and paper towel dispensers as needed. He then mopped the entire tile floor from back to front. ***Id.*** at Exhibit F (Kramer Deposition, 6/7/2018, at 36-38). Kramer, who was in college and considered this assignment to be his summer job, had never mopped a floor prior to performing this task at Ryder. Kramer was aware prior to starting this job that a tile floor could be slippery when wet and a caution sign could warn people of this fact. Jose told Kramer to put out wet floor signs when mopping as part of his training. He did not tell Kramer where to position the sign. Ryder stored wet-floor caution signs in certain bathrooms, but Kramer was unaware of such a sign being stored in the women's bathroom near the offices. ***Id.*** at Exhibit F (Kramer Deposition, 6/7/2018, at 28-29).

On the day in question, Kramer mopped the women's bathroom near the offices. He then left the recently-mopped bathroom to retrieve a wet-floor caution sign from the maintenance cage where Ryder stored the cleaning supplies. ***Id.*** at Exhibit F (Kramer Deposition, 6/7/2018, at 53).[2] By

---

[2] Despite Kramer's implicit admission that he had not set up a wet floor sign prior to mopping, and the assertion in the Wenningers' brief that he had not set up a wet floor sign, ***see*** the Wenningers' Brief at 4, Wenninger testified that after she fell, she saw a wet floor sign inside the bathroom. Wenninger

*(Footnote Continued Next Page)*

the time he had returned, Wenninger had fallen on the floor. He sometimes left the mop cart in the hallway during mopping, but did not on this particular day. He did not recall where he left the cart.

Approximately two weeks following Wenninger's accident, Ryder told Kramer his services were no longer needed. *Id.* at Exhibit F (Kramer Deposition, 6/7/2018, at 54-56). Kramer then contacted HTSS and told him he was resigning from his employment with HTSS. *Id.*

Following her accident at work, Wenninger filed a claim and obtained compensation from Ryder pursuant to the Workers' Compensation Act.[3] Subsequently, the Wenningers filed a complaint on April 21, 2017, alleging negligence against Defendants. Specifically, the complaint alleged that Kramer was negligent when he mopped the bathroom floor at Ryder, insomuch as he "allow[ed] the bathroom floor of the property to be and remain in a dangerous and defective condition" and "allow[ed] water to

---

*(Footnote Continued)*

Deposition, 6/7/2018, at 41-42. Nevertheless, this portion of Wenninger's deposition appears only in the supplemental reproduced record. Since it was neither before the trial court nor made part of the certified record, we will not consider it.

[3] As such, Ryder is not part of this lawsuit. *See Grabowski v. Carelink Community Support Servs., Inc.*, 230 A.3d 465, 471 (Pa. Super. 2020) ("[Generally,] where an injury is covered by the [Workers' Compensation Act], workers' compensation is the employee's sole remedy against her employer and the employee may not bring a tort action against her employer."); 77 P.S. § 481(a) ("The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employe[e], [her] husband, … or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death[.]").

accumulate and remain on the bathroom floor … for an unreasonable length of time so as to create an unreasonable hazard to invitees, in general, and [Wenninger] in particular." Complaint, 4/21/2017, at ¶ 9(b). The Wenningers also averred that Kramer "fail[ed] to post or display warnings to invitees, in general, and [Wenninger] in particular, of the dangers associated with water on the bathroom floor." *Id.* at ¶ 9(c).

The Wenningers averred that HTSS was vicariously liable for the acts of Kramer because Kramer was an employee of HTSS. *Id.* at ¶ 15. The Wenningers also averred that HTSS caused her injuries by its own negligent and careless conduct. Specifically, they allege that HTSS "knew or should have known that [] Kramer was not qualified, skilled[,] and/or trained to perform the tasks he was assigned at the property and was likely to perform such tasks, in general, and the mopping/cleaning of the bathroom floor, in particular, in an unsafe manner." *Id.* at ¶ 16(a). According to the Wenningers, HTSS "had information tending to suggest that [] Kramer was negligently and carelessly inclined or otherwise unfit for the assignment he was given by [] HTSS on the property and such unfitness could be ascertained through a proper screening process[.]" *Id.* at ¶ 16(b). They further alleged HTSS breached its duty of care and failed to exercise the proper degree of care by assigning Kramer to Ryder without "proper screening, training[,] and instruction[,]" and ensuring that he "possessed the necessary knowledge and skill regarding how to properly mop and clean

a floor, in order to minimize the accumulation of water" and "properly post caution signs and restrict access to an area where he created a wet floor hazard to those walking on the property." *Id.* at ¶ 16(c)-(e).

Defendants filed an answer denying the allegations and pleading a new matter, to which the Wenningers replied. Following the close of discovery, Defendants moved for summary judgment against the Wenningers. Defendants argued that HTSS was immune from vicarious liability because Kramer worked under Ryder's direction and control as a borrowed employee, and pursuant to 77 P.S. § 481, the Wenningers' exclusive remedy was through the Workers' Compensation Act from Ryder. Motion for Summary Judgment, 4/2/2019, at ¶¶ 40-51. Additionally, Defendants argued that because Kramer was Wenninger's co-worker and acting in the scope of his employment at the time of the incident, Kramer was not personally liable for any injuries from the incident pursuant to 77 P.S. § 72. Motion for Summary Judgment, 4/2/2019, at ¶¶ 52-66.

The Wenningers filed a response, arguing that the borrowed employee doctrine did not apply and/or there were disputes of material fact because HTSS retained control over Kramer. Wenningers' Reply to Motion for Summary Judgment, 4/25/2019, at ¶¶ 7-65. They further argued Wenninger and Kramer were not in the same employ because one worked for Ryder and the other for HTSS. *Id.* They also asserted that the motion for summary

judgment did not address the Wenningers' claim for negligent placement and training against HTSS. *Id.* at ¶¶ 35, 49.

On September 13, 2019, the trial court granted summary judgment in favor of Defendants and against the Wenningers. The Wenningers timely filed a notice of appeal, and both the Wenningers and the trial court complied with Pa.R.A.P. 1925. On appeal, the Wenningers raise the following claims, which we reorder for ease of disposition:

> A. Whether the trial court committed an abuse of discretion and/or error of law in failing to even consider whether an employment agency, HTSS, waived the borrowed employee defense by contract.
>
> B. Whether the trial court committed an abuse of discretion or an error of law in failing to find that genuine issues of material fact existed as to the application of the borrowed employee defense.
>
> C. Whether the trial court committed an abuse of discretion and/or error of law in failing to provide the Wenningers with the benefit of all favorable testimony and every reasonable inference of fact regarding the establishment of an independent cause of action against HTSS for failure to train and properly place Kramer in a position whereby he caused injury to Wenninger.

The Wenningers' Brief at 3-4 (quotation marks omitted; capitalization and party designations altered).

We review an appeal from the grant of summary judgment mindful of the following:

> Our standard of review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

***Krauss v. Trane U.S. Inc.***, 104 A.3d 556, 562-63 (Pa. Super. 2014). Our Supreme Court has emphasized "that it is not [a] court's function upon summary judgment to decide issues of fact, but only to decide whether there is an issue of fact to be tried." ***Fine v. Checcio***, 870 A.2d 850, 862 (Pa. 2005) (citing Pa.R.C.P. 1035.2(1)).

We begin by addressing the Wenningers' first and second issues challenging the trial court's grant of summary judgment to Defendants based upon its finding that Kramer was a borrowed employee of Ryder. Wenningers' Brief at 21, 25.

The borrowed employee doctrine, also known as the borrowed servant doctrine, "is an outgrowth of the common law rule that a servant who is loaned by his master to a third party is regarded as the servant of that third party while under that third party's direction and control." ***Shamis v. Moon***, 81 A.3d 962, 969-70 (Pa. Super. 2013); ***see also Mature v. Angelo***, 97

A.2d 59, 60 (Pa. 1953) ("One who is in the general employ of another may, with respect to certain work, be transferred to the service of a third person in such a way that he becomes, for the time being and in the particular service which he is engaged to perform, an employe[e] of that person.").

> The law governing the "borrowed" employee is well-established. The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor. Although the examination of these factors guides the determination, each case must be decided on its own facts.

*Gardner v. MIA Products Co.*, 189 A.3d 441, 444 (Pa. Super. 2018) (quoting *JFC Temps, Inc. v. WCAB (Lindsay)*, 680 A.2d 862, 864 (Pa. 1996)). The "right to control the performance of the work is the overriding factor" in determining whether an entity is an employer for purposes of workers' compensation under the borrowed employee doctrine. *JFC Temps, Inc.*, 680 A.2d at 865.

> Whether a company is [a] worker's employer under the borrowed employee doctrine under a given set of facts is a question of law. If there is conflicting evidence as to the direction, supervision or control of the work, there are disputes of material fact and summary judgment cannot be granted. *Gardner*, 189 A.3d at 444-47 (reversing summary judgment where there was evidence that both staffing company and company where work was done had supervisors on site who

instructed workers); [**Shamis,** 81 A.3d at 965-67, 971-73] (reversing summary judgment where there was evidence that defendant supervised plaintiff's work, but was also evidence that other company that paid plaintiff was required by contract to provide all supervision of plaintiff's work).

**Burrell v. Streamlight, Inc.**, 222 A.3d 1137, 1140 (Pa. Super. 2019). Pursuant to our standard of review, we are required to examine the facts in the light most favorable to the non-moving party, which is the Wenningers. **Gardner**, 189 A.3d at 444.

In the instant case, Defendants have invoked the borrowed employee doctrine to argue that Kramer was a borrowed employee of Ryder at the time of the incident and, therefore, the Wenningers can recover workers' compensation from Ryder only. This is because if an individual is injured by the act or omission of another person in the same employ, liability is limited by the Workers' Compensation Act.

> If disability … is compensable under this act, a person shall not be liable to anyone at common law or otherwise on account of such disability … for any act or omission occurring while such person was in the same employ as the person disabled …, except for intentional wrong.

77 P.S. § 72. Thus, the viability of the Wenningers' action against Kramer depends on whether or not Wenninger and Kramer were in the same employ. Further, the claim against HTSS for vicarious liability is derivative of the claim against Kramer; if Kramer is not liable for his acts or omissions, neither is HTSS. **See Mamalis v. Atlas Van Lines, Inc.**, 560 A.2d 1380, 1383 (Pa. 1989) ("A claim of vicarious liability is inseparable from the claim

- 11 -

against the agent since any cause of action is based on the acts of only one tortfeasor.").

With that background, we turn now to the specific arguments of the Wenningers. First, the Wenningers claim that HTSS waived by contract its argument that Kramer was the borrowed employee of Ryder. Wenningers' Brief at 21-22. They argue that because HTSS made Kramer sign documents as part of his employment with HTSS stating Kramer was an employee of HTSS and not any HTSS customer to which he was assigned,[4] Defendants cannot now claim Kramer was an employee of Ryder.[5] The Wenningers' Brief at 22-23.

---

[4] For example, Kramer signed a "Policies and Procedures Checklist," which states in pertinent part, "I understand that I am an employee of this staffing company and only this staffing company or I can terminate my employment. When an assignment ends I must report to this staffing company for my next job assignment." Motion for Summary Judgment, 4/2/2019, at Exhibit G. The Wenningers cite to other employment documents between HTSS and Kramer, such as a waiver and release of claims, wherein Kramer acknowledged that any work-related injuries he sustained would be covered by HTSS's workers' compensation insurance and he agreed not to sue or make a claim against any HTSS customer related to work-related injuries, and an HTSS employee handbook and orientation slides explaining that HTSS was his employer and he was not an employee of HTSS's customer. The Wenningers' Brief at 22-23. Although it appears that all or some of these may have been exhibits to the Wenningers' reply to Defendants' summary judgment motion, they were not transmitted to this Court as part of the certified record. Nevertheless, given our disposition, their absence does not affect our appellate review.

[5] We note that the Wenningers do not raise any sort of an estoppel argument, such as claiming HTSS took a contrary position in prior litigation or suggesting that Wenninger was aware of and induced to change her behavior because of the employment documents between Kramer and HTSS.
*(Footnote Continued Next Page)*

The Wenningers cite no law in support of their waiver argument, perhaps because the law is not favorable to their position. This Court has held that "[t]he test … is whether [a company] had the right to direct and control [an individual's] work and the manner of [his] performance, not the nomenclature used by the parties." **Burrell**, 222 A.3d at 1142; **see also Wilkinson v. K-Mart**, 603 A.2d 659, 662 (Pa. Super. 1992) (holding that for purposes of the borrowed employee doctrine, "the determining factor is the actual conduct of the parties," not how they classified the relationship in a contract). In other words, the agreement of HTSS and Kramer upon Kramer's hire that Kramer would be an employee of HTSS cannot override the application of the borrowed employee doctrine if Ryder in fact had the right to control Kramer and become his legal borrowed employer.

Furthermore, the Wenningers' argument is predicated on the assumption that only Ryder **or** HTSS could be Kramer's employer for purposes of immunity under the Workers' Compensation Act. However, the Workers' Compensation Act does not mandate that an employee can have only one employer or that only one employer could invoke the immunity afforded by the Act. In **Nagle v. TrueBlue, Inc.**, 148 A.3d 946, 955-61 (Pa. Cmwlth. 2016), after a thorough and persuasive analysis of law from this Court, the Commonwealth Court, our Supreme Court, and another

*(Footnote Continued)* ───────────────

**C.f. Black v. Labor Ready, Inc.**, 995 A.2d 875, 878 (Pa. Super. 2010) (explaining judicial estoppel); **Novelty Knitting Mills, Inc. v. Siskind**, 457 A.2d 502, 503 (Pa. 1983) (explaining equitable estoppel).

jurisdiction, the Commonwealth Court[6] determined that the Workers' Compensation Act permitted both a temporary staffing agency and the agency's customer to be considered a temporary worker's employer for the purposes of workers' compensation benefits and immunity from tort suits. The temporary staffing agency was the worker's employer because it had provided his workers' compensation benefits. The agency's customer directed and controlled the worker's work on the job and, therefore, was his borrowing employer.[7] Accordingly, HTSS and Kramer's agreement in the employment documents that HTSS was Kramer's employer and provider of his workers' compensation benefits does not necessarily preclude Ryder from

---

[6] "This Court is not bound by decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." *Sampathkumar v. Chase Home Finance, LLC*, 241 A.3d 1122, 1139 n.8 (Pa. Super. 2020).

[7] *Accord Capozzoli v. Stone & Webster Eng'g Corp.,* 42 A.2d 524, 526 (Pa. 1945) (holding that contractor, which had carried deceased employee on its workers' compensation insurance, was deceased employee's actual employer; subcontractor was employee's statutory employer, which is a legal doctrine similar to but separate from the borrowed employee doctrine; and both actual and statutory employer were immune from a tort suit by deceased employee's estate); *Pastore v. Anjo Const. Co.*, 578 A.2d 21, 25 (Pa. Super. 1990) (same). *But see Gardner*, 189 A.3d at 445 n. 4 (opining in *dicta* that this Court has implied that there can be only one employer under the Workers' Compensation Act) (quoting *English v. Lehigh County Authority,* 428 A.2d 1343, 1346 n.1 (Pa. Super. 1981) ("As a practical matter, however, [staffing agency's appeal] is of no significance, for in deciding the appeal[] by [deceased worker's estate] administrator … from the order[] granting summary judgment in favor of the [staffing agency's customer], we shall necessarily decide whether [the staffing agency or the customer] was [deceased worker's] employer.")).

also being his employer with respect to this incident under the borrowed employee doctrine. Accordingly, no relief is due on the Wenninger's waiver argument.

In their second issue, the Wenningers argue that the trial court erred by granting Defendants' motion for summary judgment because genuine issues of material fact exist as to the applicability of the borrowed employee doctrine. Wenningers' Brief at 26. They argue that because Kramer could determine the order and method of completing the tasks assigned by Ryder in the task list, HTSS had not relinquished direction and control of Kramer. *Id.* at 27. Additionally, they highlight that HTSS selected Kramer for the job assignment, retained the right to discharge Kramer from his assignment, and issued Kramer's paychecks, and they argue these indicators show Kramer remained the employee of HTSS. *Id.* at 28-29.

The trial court defended its ruling with the following rationale:

[T]here is not a genuine issue of material fact as to Ryder['s] exerting exclusive control over Kramer. It is uncontroverted that in May 2015, Ryder submitted two orders to HTSS to fill temporary cleanup positions at its Quakertown warehouse: one for a janitorial worker, for an indefinite duration, to perform "sanitation of warehouse, no bathrooms, have corp[rate] [*sic*] coming in, clean up warehouse. Couple days, if they do well could possibly move into co-pack area. Monday thru [*sic*] Friday 8 a.m. to 4:30 p.m. $10 hr." and the second for a cleanup worker, for a [three] week duration to "work outside doing general cleanup Monday through Friday, 8:00 a.m. to 4:00 p.m. $10 hr. in Quakertown area." [Motion for Summary Judgment at Exhibit E]. It is undisputed that the position Ryder sought to fulfill expressly excluded bathrooms and therefore if Kramer began cleaning bathrooms, Ryder took over the control of the manner of how Kramer performed this duty. Ryder defined the

skills and tasks for the temporary general cleanup position when it requested a temporary employee from HTSS.

Trial Court Opinion (TCO), 1/6/2020, at 6-7 (party designations altered).

Upon review, we agree with the Wenningers that the trial court's findings regarding the scope of the work are not supported by undisputed facts in the record. HTSS produced two work orders in discovery showing that Ryder requested two workers from HTSS in May 2015. Motion for Summary Judgment, 4/2/2019, at Exhibit E. But the parties dispute whether the work orders pertained to Kramer and whether Ryder enlarged the job to include cleaning bathrooms on its own initiative after Kramer started his assignment. Furthermore, while the parties agree that the arrangement between Ryder and HTSS operated generally with Ryder's defining the skills and tasks for the position and HTSS's filling the position accordingly, there is a dispute of material fact over what skills and tasks Ryder requested in this instance.

Wenninger testified that she told HTSS that Ryder "need[ed] a laborer" and "need[ed] someone to clean bathrooms." *Id.* at Exhibit C (Wenninger Deposition, 6/7/2018, at 21). Wenninger stated Ryder "asked [her] to get someone to clean the bathrooms, general cleanup, wash the floor in the hallway, sweep up in the back …. But it was focused on the bathroom, because we had five of them and they needed to be cleaned. We had six shifts. So there was a lot of usage." *Id.* at Exhibit C (Wenninger Deposition, 6/7/2018, at 24).

In contrast, HTSS's corporate designee and vice-president, Arlyce Kusler, testified that Kramer "was attached to one of the work orders" and "[a]ccording to the order, [Kramer] was hired to do general cleanup in the warehouse and outdoors of the property." *Id.* at Exhibit D (Kusler Deposition, 9/20/2018, at 31). Nevertheless, Kusler conceded she could not connect Kramer's assignment with either work order based off of the information on the work order and neither order identified the $14.80 rate HTSS billed Ryder for Kramer's time. *Id.* at Exhibit D (Kusler Deposition, 9/20/2018, at 35, 40). Therefore, the trial court's findings regarding the scope of the work are neither supported by the record nor based on facts viewed in the light most favorable to the Wenningers.

In addition to the work orders, the trial court found it significant that "Ryder set Kramer's work hours, identified the location where Kramer would work, described and showed Kramer the manner how to perform his work, provided Kramer with safety equipment and cleaning supplies to do his work, and after Wenninger's fall terminated Kramer from working at Ryder." TCO at 6-7 (party designations altered). To combat this part of the trial court's analysis, the Wenningers argue that because Kramer could determine the order and method of completing the tasks assigned by Ryder in its task list, HTSS had not relinquished direction and control of Kramer. The Wenningers' Brief at 27. Additionally, they highlight that HTSS selected

- 17 -

Kramer for the job assignment, retained the right to discharge Kramer from his assignment, and issued Kramer's paychecks. *Id.*

In *JFC Temps., Inc.*, a temporary agency supplied a truck driver to its client G & B. In weighing the factors to determine whether the temporary agency or G & B was the driver's employer for purposes of injuries from an accident the driver sustained on the job, our Supreme Court recognized that the temporary agency selected the driver for the position at G & B after examining his qualifications, it had the sole power to terminate the driver's employment, and the driver called off sick to the agency. *JFC Temps., Inc.*, 680 A.2d at 865. Nevertheless, since "the right to control the performance of the work [was] the overriding factor," the Court determined G & B was the driver's employer under the borrowed employee doctrine. *Id.* The Supreme Court found it persuasive that G & B directed the driver as to the specifics of deliveries to be made; the driver reported to G & B at the beginning and end of each day; performed miscellaneous odd jobs under the direction of G & B personnel; completed time slips and evaluated the driver's performance; and had the right to select the routes taken by the driver, even if in practice the driver chose the routes. The temporary agency did not instruct the driver regarding the performance of his work once he began the job at G & B and agency personnel were not present at the worksite. "In fact, [the agency] had no substantial contact with [the driver] other than processing his paycheck." *Id.* at 158.

Like the driver in **_JFC Temps. Inc._**, the fact that Kramer decided the order in which he completed the cleaning tasks is not determinative because Ryder could have told Kramer to change the order at any time. HTSS issued his paycheck, but Kramer did not have day-to-day interaction with HTSS on the job site. No representative of HTSS was present. If Kramer had questions about his work, Ryder instructed Kramer to ask Jose or the maintenance supervisor, who were Ryder employees.

However, when we view the facts in the light most favorable to the Wenningers, as we must, some dispute of material fact remains regarding the control over Kramer's tasks. Ryder's provision of the daily task list is not dispositive, as the mere fact that Ryder "point[ed] out … from time to time the work to be done and the place where it is to be performed does not in any way militate against the continuance of the relation of employe[e] and employer between" Kramer and HTSS. **_See Mature_**, 97 A.2d at 61. In his deposition, Kramer described his own strategies for how he tackled the overall list for maximum efficiency as well as his particular method for cleaning the bathroom, but it is not clear whether Kramer came up with this method himself or whether he was following Jose's instructions.

Moreover, Wenninger testified that Ryder directed Kramer "as to **what** we needed to have accomplished" and "show[ed] him this is what we need to do" and "this is why you are here." Motion for Summary Judgment, 4/21/2019, at Exhibit C (Wenninger Deposition, 6/7/2018, at 27) (emphasis

added). Kramer, on the other hand, testified that Ryder showed him "[h]ere's **how** you perform these acts" and was "kind of a monkey see, monkey do to replicate what he did." *Id.* at Exhibit F (Kramer Deposition, 6/7/2018, at 23-24) (emphasis added). Jose, a Ryder employee, told Kramer he needed to put out a wet floor sign and showed him where to get the sign, but not where to put it. *Id.* at Exhibit F (Kramer Deposition, 6/7/2018, at 28). The record is not clear if Jose instructed Kramer about when in the process to put the sign out.

Taken as a whole in the light most favorable to the Wenningers, it is not clear whether Ryder "assume[d] control of [Kramer's] **manner** of performing the work." *Gardner*, 189 A.3d at 444 (emphasis added). The evidence "may well allow for a finding in [Defendants'] favor," but questions of fact remain on the most crucial factor, which is worker control. *Id.* at 446-47. Because the evidence supporting Defendants' motion for summary judgment was not "so compelling as to resolve all questions of material fact regarding the issue of worker control," *id.*, we conclude that the trial court abused its discretion in granting summary judgment in favor of Defendants on the negligence claim against Kramer and the vicarious liability claim against HTSS.

In the final issue, the Wenningers argue that the trial court committed an error of law by improperly conflating their direct negligence claim against HTSS with their derivative vicarious liability claim. The Wenningers' Brief at

14-20. The Wenningers point to paragraph 16 of their complaint in which they claim they set out a direct negligence claim against HTSS, which alleged that HTSS knew or should have known Kramer did not have qualifications, skill, and training for the cleaning position and was likely to mop the floor in an unsafe manner and, therefore, breached a duty of care by assigning Kramer to Ryder without proper training. *Id.* (citing Complaint, 4/21/2017, at ¶ 16(a)-(e)). According to the Wenningers, Kramer's inexperience in mopping floors is at odds with HTSS's representations to its clients on its website, wherein HTSS promises to screen its candidates to match the candidate's skill level to the assignment. They stress that because there was a dispute of material fact as to the scope of the assignment requested by Ryder as reflected in the work orders discussed *supra*, the jury should decide whether Ryder's request included or excluded bathrooms, which would impact the skill level of the worker HTSS selected. The Wenningers assert that the borrowed employee doctrine is not relevant to this direct negligence claim because HTSS breached a duty to Wenninger directly and, therefore, the trial court erred by granting summary judgment on count II of their complaint in its entirety.

Upon review of the Wenningers' complaint, we agree that count two of the complaint attempts to set forth two negligence theories against HTSS: one based on vicarious liability for its agent's actions, *i.e.*, the doctrine of *respondent superior*, and one based upon a theory that HTSS breached a

duty of care to Ryder and its employees by assigning an employee without the skills to perform the job when it knew or should have known such skills were required to perform the job without causing a foreseeable risk of harm. As our Supreme Court has explained,

> [t]o prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternately. Liability for negligent injury is direct when the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff. By comparison, vicarious liability is a policy-based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the ability to pay.
>
> Where a corporation is concerned, the ready distinction between direct and vicarious liability is somewhat obscured because we accept the general premise that the corporation acts through its officers, employees, and other agents. The corporation, as principal, assumes the risk of individual agents' negligence under the theory of vicarious liability. In this scenario, the corporation's liability is derivative of the agents' breach of their duties of care to the plaintiff. But, this Court has also recognized that a corporation may also owe duties of care directly to a plaintiff, separate from those of its individual agents, such as duties to maintain safe facilities, and to hire and oversee competent staff. Accordingly, as a general proposition, the recognition that a corporation acts through its agents has not been held to be a fatal impediment to haling a corporation into court on direct liability tort claims.

***Scampone v. Highland Park Care Center, LLC***, 57 A.3d 582, 597-98 (Pa. 2012).

We offer no opinion regarding the clarity or artfulness of the complaint, or the viability of such a claim. But it is clear that HTSS moved for summary judgment solely on a vicarious liability claim against it for Kramer's actions. *See* Motion for Summary Judgment, 4/2/2019, at ¶ 40. In response, the Wenningers asserted that in addition to a vicarious liability claim, they also brought a direct liability claim wherein they asserted that HTSS breached a duty it owed directly to Wenninger. Reply to Motion for Summary Judgment, 4/25/2018, at ¶ 49; Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, 4/25/2019, at 6. The trial court did not address the Wenningers' assertion in its opinion. *See* TCO at 1 (characterizing the Wenningers' claim against HTSS as a vicarious liability claim). Because HTSS only moved for summary judgment regarding vicarious liability, but the Wenningers also have asserted a direct negligence claim, the trial court erred in entering judgment on count II in its entirety.

Based on the foregoing, we vacate the trial court's grant of summary judgment in favor of Defendants and against the Wenningers and remand to the trial court for further proceedings.

Judgment vacated. Remand for further proceedings in accordance with this memorandum. Jurisdiction relinquished.

*Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/21