J-S39034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ANTHONY MASON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NORTHEAST ARCHITECTURAL | : | No. 735 MDA 2023 |
| PRODUCTS D/B/A DARON | : | |
| NORTHEAST | : | |

Appeal from the Order Entered April 28, 2023
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  2017-06152

BEFORE:  DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:            **FILED: DECEMBER 21, 2023**

Anthony Mason (Mason) appeals from the order entered in the Lackawanna County Court of Common Pleas entering summary judgment in favor of Northeast Architectural Products d/b/a/ Daron Northeast (Daron) in this negligence action seeking damages for a work-related injury.  On appeal, Mason contends the trial court erred in determining, as a matter of law, that he was Daron's "borrowed employee" at the time of the incident, and, therefore, Daron was immune from liability under the exclusivity provisions of Pennsylvania's Workers' Compensation Act (WCA).[1]  For the reasons below, we affirm.

---

[1] **See** 77 P.S. § 1 *et seq*.

Mason instituted this negligence action following a work-related injury he suffered on January 22, 2016, while working at Daron's manufacturing plant. Daron produces "[h]ardscape products," such as pavers and concrete blocks. **See** Daron's Motion for Summary Judgment, 2/3/23, Exhibit G, Deposition of Michael Kapuscinski, 12/1/22 (Kapuscinski's Deposition) at 10.[2] Approximately a month prior, Mason went to Express Services, Inc. (Express), a temporary employment agency, in search of employment. **See** Daron's Motion for Summary Judgment, Exhibit I, Deposition of Anthony Mason, 11/1/21 (Mason's Deposition) at 33-34. He filled out paperwork for Express and was told about an inspector position at Daron. **Id.** at 35. Express explained "it was a physically demanding job, very fast-pace[d], 12-hour days[,]" and instructed him to report to Daron at 5:00 a.m. the next workday. **Id.** at 35-37.

When Mason arrived at Daron for work, one of Daron's supervisors, Dale, gave him and the other new workers a tour of the facility, and provided them with hearing protection, eyewear, and gloves. **See** Mason's Deposition at 39-40. He had been informed by Express that he needed to wear steel-toed boots. **Id.** at 40. Dale had a "brief" discussion with Mason concerning his job responsibilities, which included "inspection of the . . . bricks [as they]

_____

[2] Kapuscinski was Daron's operations manager at the time of Mason's employment. Kapuscinski's Deposition at 9-10.

were coming out of the mold[,]" and the removal of any defective bricks from the conveyor belt before they went into the "palletizer." *Id.* at 40-41, 51.

The accident occurred when Mason stopped the conveyer belt after noticing "a brick was angled improperly" as it entered the palletizer. Mason's Complaint, 5/15/20, at 4. In order to "access the line," Mason had to enter a caged-off area near a mechanical arm. *Id.* He had been told that when he opened the cage door, "magnetization would stop everything . . . inside the fence[,]" including the mechanical arm. *See* Mason's Deposition at 57. However, upon entering the area, the mechanical "arm struck him, and pinned him against a barrier . . . causing severe injuries[.]" Mason's Complaint at 4. Mason subsequently received workers' compensation benefits from Express.[3] *See* N.T., 4/11/23, at 4.

Mason initiated this negligence action against Daron by filing a *praceipe* for writ of summons on November 21, 2017. Subsequently, on May 15, 2020, Mason filed a complaint,[4] and Daron thereafter filed an answer and new

_____

[3] We note that none of Mason's workers' compensation documents are included in the certified record. Indeed, the only reference to the fact that Mason received workers' compensation benefits from Express was by Daron's attorney during argument on the motion for summary judgment. *See* N.T., 4/11/23, at 4.

[4] It appears from the record that Mason did not have the proper name and address of Daron for an extended period of time after he filed the *praecipe* for writ of summons, and thus, was unable to complete service of process. The record includes a Stipulation, dated January 8, 2020, in which counsel for both parties agreed that "Northeast Architectural Products d/b/a Daron Northeast" *(Footnote Continued Next Page)*

matter, asserting, *inter alia*, it was statutorily immune from liability as Mason's employer. *See* Daron's Answer & New Matter to Mason's Complaint, 7/23/20, at 20.

After discovery was complete, on February 3, 2023, Daron filed a motion for summary judgment, arguing, *inter alia*, there was no genuine issue of material fact that Mason was Daron's borrowed employee, and, therefore, Daron was entitled to workers' compensation immunity. *See* Daron's Motion for Summary Judgment at 9. Mason filed an answer, and the trial court conducted oral argument on April 11, 2023.

Thereafter, on April 28, 2023, the trial court granted Daron's motion and entered judgment in its favor. This timely appeal by Mason follows.[5]

Mason purports to raise three issues for our review:

I.    Whether [Daron] is considered a statutory employer[?]

II.    Whether the trial court erred in granting [Daron's] motion for summary judgment[?]

III.    Whether the trial court erred in ruling . . . Mason was [Daron's] borrowed employee as a matter of law[?]

Mason's Brief at 5. Because all three of Mason's claims challenge the trial court's determination that he was Daron's "borrowed employee" for purposes of WCA immunity, we address the claims together.

_____

was the proper party, and that all other named defendants were dismissed without prejudice. *See* Stipulation, 1/8/20.

[5] Mason complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

A trial court may grant summary judgment "when the record clearly shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." **Krepps v. Snyder**, 112 A.3d 1246, 1258 (Pa. Super. 2015) (citation omitted). When considering a trial court's order granting summary judgment:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. . . . Our scope of review . . . is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

**Gardner v. MIA Prod. Co.**, 189 A.3d 441, 443 (Pa. Super. 2018) (citation omitted).

"[T]he WCA requires employers to pay employees who are injured on the job workers' compensation benefits regardless of negligence[,]" in exchange for which employers receive immunity from tort liability with respect to work-related injuries. **Brown v. Gaydos**, ___ A.3d ___, ___ 2023 PA Super 258, *3 (Pa. Super. Dec. 7, 2023) (*en banc*) (citation omitted). **See also** 77 P.S. § 481(a).

Preliminarily, we emphasize that the trial court did **not** find Daron was Mason's "statutory employer" for purposes of WCA immunity pursuant to the five-part test outlined in **McDonald v. Levinson Steel Co.**, 153 A. 424 (Pa. 1930). **See id.** at 426 (requiring the following elements to create "statutory employer" relationship: (1) employer is under contract with owner or one in position of owner; (2) premises is under control of or occupied by owner; (3)

- 5 -

subcontract made by employer; (4) employer entrusted part of regular business to subcontractor; and (3) injured worker is employee of subcontractor). ***See also*** 77 P.S. § 52. Despite the fact that Mason addresses "statutory employer" immunity in his first issue, he concedes that Daron "did not assert this area of immunity." ***See*** Mason's Brief at 14.

Rather, the trial court found Daron was immune from liability under the WCA because Mason was his "borrowed employee" or "borrowed servant."

> [T]he borrowed servant doctrine is an outgrowth of the common law rule that a servant who is **loaned** by his master to a third party is regarded as the servant of that third party while under that third party's direction and control. The "borrowing employer" is thus the common-law master of the borrowed employee — and, by definition, the borrowing employer cannot be a statutory employer. . . .

***Shamis v. Moon***, 81 A.3d 962, 969–70 (Pa. Super. 2013) (citations & quotation marks omitted; emphasis in original). The courts of this Commonwealth have applied the following test to determine whether an injured worker is a "borrowed employee" for purposes of WCA immunity:

> The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is **whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised.** Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor. Although the examination of these factors guides the determination, each case must be decided on its own facts.

*Burrell v. Streamlight, Inc.*, 222 A.3d 1137, 1139–40 (Pa. Super. 2019) (emphasis in original), *citing JFC Temps, Inc. v. W.C.A.B. (Lindsay)*, 680 A.2d 862, 864 (Pa. 1996).

In the present case, the trial court determined that the record supported a finding, as a matter of law, that Mason was Daron's "borrowed employee," and, therefore, Daron was immune from tort liability for Mason's workplace injury. The court opined:

> There is no issue of fact here that Daron had the right to control Mason's work and the manner in which it was performed. There is no evidence to suggest that Express . . . directed Mason to do anything but show up at a determined time, it did not direct how his work was to be performed and it did not have any supervisory personnel at Daron's facilities. While it is undisputed that representatives of Express . . . visited Daron's facilities, they did so once or twice a year and it was more in the nature of a "sales call." Indeed, Mason was not aware when those visits took place nor did he witness any such visits.
>
> All in all, we are satisfied that Daron had the right to control Mason's work and the manner in which it was performed. Daron was, as a matter of law, Mason's employer under the Workers' Compensation Act and immune from personal injury tort liability.

Trial Ct. Op. at 10-11.

Mason argues, however, that the record contains disputed issues of material fact as to whether Daron or Express was Mason's employer at the time of his injury. *See* Mason's Brief at 14. He contends that although the trial court found Daron had "the right to supervise and direct Mason's work[,] the testimony[,] taken in the light most favorable to the non-movant, demonstrates that other than a tour of the facility, . . . Mason received most of his day to day direction from fellow employees." *Id.* at 16.

Mason emphasizes the following: Express told him about the position at Daron and "instructed him to show up there the next day." Mason's Brief at 16, *citing* Mason's Deposition at 35. Express "clearly told him what his job duties were, what his assignments would be, and . . . what he would be doing on a daily basis." *Id.* at 17, *citing* Mason's Deposition at 66-68. Although a Daron supervisor, named Dale, gave him a "short initial tour of the plant" his first day, he was not required to complete any paperwork or meet with any other Daron employees. *Id.*, *citing* Mason's Deposition at 40-41. Further, his on-the-job training "primarily came from Express in the form of the other Express employees[.]" *See id.* at 17, 23, *citing* Mason's Deposition at 66-68. Daron did not hire him and had no authority to fire him, and Express paid him directly. *Id.* at 21, *citing* Daron's Motion for Summary Judgment, 2/3/23, Exhibit H, Deposition of Nathan J. Keisling, 11/1/21 (Keisling's Deposition) at 42, 55.[6] Moreover, he "directly and explicitly testified that [he] didn't actually work for Daron, [he] actually worked for Express." *Id.*, *citing* Mason's Deposition at 27. Based upon these facts, Mason insists the record contains a genuine issue of material fact concerning which entity was his employer at the time of his injury.

Viewing the evidence in the light most favorable to Mason, the non-moving party, we detect no error of law or abuse of discretion in the trial

---

[6] Keisling testified as Daron's corporate designee. *See* Keisling's Deposition at 10-11.

court's determination that that Mason was Daron's "borrowed employee" at the time of his workplace injury, and therefore, Daron is immune from liability pursuant to the WCA. **See Gardner**, 189 A.3d at 443. This Court's decision in **Burrell**, **supra**, is instructive.

In that case, "Plaintiff was a temporary worker hired by Aerotek, Inc. . . ., a recruiting agency, and was placed by Aerotek to work for Defendant as a temporary worker at Defendant's facility." **Burrell**, 222 A.3d at 1139. Plaintiff was injured at Defendant's facility "when he fell during his work shift while disposing of trash in the trash compactor[.]" **Id.** at 1138-39. Although Plaintiff received workers' compensation benefits, he later filed a negligence action against Defendant. **See id.** at 1139. Defendant in turn claimed it was immune from liability under the WCA because Plaintiff was its "borrowed servant" at the time of the incident. **Id.** The trial court granted Defendant's motion for summary judgment and Plaintiff appealed. **See id.**

A panel of this Court affirmed, concluding "the undisputed facts established that Defendant was Plaintiff's employer under the WCA and was therefore immune from tort liability for Plaintiff's injury[.]" **Burrell**, 222 A.3d at 1143. The panel discussed the following relevant facts. First, unlike the case before us, Aerotek and Defendant were under contract, which indicated "that all personnel supplied by Aerotek **were employees of Aerotek, not Defendant**." **Id.** at 1140 (emphasis added). Indeed, the contract explicitly stated:

[N]othing in this Agreement shall be regarded as creating any relationship, whether as employer-employee, joint employer, as a joint-venture, partner or shareholder between the parties or between [Defendant] and the Personnel. . . .

*Id.* at 1140-41 (record citation omitted). Moreover, the contract provided that Aerotek would pay all personnel and furnish workers compensation insurance "that included Defendant as an alternate employer." ***Id.***

Notably, the contract also provided that all work would be performed at Defendant's facility and under its "technical management and supervision[,]" and that "Defendant could terminate an individual's work at its facility." ***Burrell***, 222 A.3d at 1141 (record citation omitted). However, employees were directed to request leave and scheduling changes through Aerotek. ***See id.***

Further, Plaintiff testified that he was interviewed by Defendant before being assigned a job there by Aerotek, and that Defendant "set his hours and job duties[.]" ***See Burrell***, 222 A.3d at 1141. Moreover,

his work was supervised by Defendant and . . . employees of Defendant showed him how to do his assigned work and answered any questions about the work. Plaintiff testified that there were no Aerotek supervisors at Defendant's facility, and that he did not have any significant interaction with Aerotek while working at Defendant's facility. Plaintiff communicated with Defendant, not Aerotek, concerning his hours.

***Id.***

Based upon these facts, the ***Burrell*** panel concluded: "[The] undisputed evidence established that while Aerotek hired and paid Plaintiff, Defendant, and not Aerotek, had the right to control Plaintiff's work and the

manner in which it was performed." **Burrell**, 222 A.3d at 1141. The **Burrell** Court explained that while the contract between Aerotek and Defendant provided that all personnel would be employees of Aerotek, the relevant test is "whether Defendant had the right to direct and control Plaintiff's work and the manner of its performance, not the nomenclature used by the parties." **Id.** at 1142.

Here, unlike in **Burrell**, there was no contract between Express and Daron — and, therefore, no explicit language describing the relationship between the parties. Moreover, the fact that Mason may have testified that he worked for Express,[7] and not Daron, is of no moment. **See** Mason's Deposition at 25. As the **Burrell** Court opined, the relevant consideration is whether Daron had **the right to direct and control the manner of Mason's work**, and not whether Mason considered himself to be an employee of Daron. **See Burrell**, 222 A.3d at 1142.

Mason acknowledged that when he arrived at Daron, he was met by a Daron supervisor — Dale — who gave him a tour of the plant, provided him with safety equipment, and explained Mason's job duties. **See** Mason's Deposition at 39-40. Mason testified at his deposition:

---

[7] We note that Mason was not directly asked whether he considered himself to be an employee or Express or Daron. Rather, when questioned whether he worked at another company — Ace Grease — "before or after [his] injury[,]" Mason stated, unresponsively, "I didn't actually work for Daron, I actually worked for Express." **See** Mason's Deposition at 25.

[Dale] basically just told me that I would be responsible for the inspection of . . . the bricks that were coming out of the mold. . . .

I would inspect those bricks. If they were bad, . . . then I was to remove them, place another brick in its place. And I also was to keep all of the bricks in order. Because going down the conveyor belt, they would sometimes get twisted and things like that.

*Id.* at 40-41. Although Mason characterized this as a "pretty brief" discussion, it is clear the Daron supervisor instructed Mason regarding "the manner" in which he was to perform his job. *See Burrell*, 222 A.3d at 1140 (citation & emphasis omitted).

Mason claims, however, that his on-the-job training "primarily came from Express in the form of other Express employees." *See* Mason's Brief at 17, 23. He testified:

The guy that . . . pretty much told me what to do on a daily basis was the guy that worked for Express, that was an employee just like me. He just basically . . . told me what was going on on a day-to-day basis.

Dale was around . . . and Dale did show some things that had to be done. But for the most part, it was just the guys that were on the line, that were instructing . . . what you had to do.

* * *

They were coworkers. But they were given the authority through the supervisors to tell us what to do.

Mason's Deposition at 68.

Mason's testimony clarifies that the "Express employees" who he claims trained him and directed his work were actually employees like him, who were placed at Daron by Express. Thus, they trained Mason in their capacity as

employees of Daron, not as employees of Express. A panel of this Court rejected a similar claim in ***English v. Lehigh County Authority***, 428 A.2d 1343 (Pa. Super. 1981).

In that case, Kelly Labor contracted with Lehigh County Authority to "supply temporary labor to take samples of sewage[.]" ***English***, 428 A.2d at 1346. Plaintiff was directed by Kelly Labor to report for work at a sewage pretreatment plant. ***Id.*** He was then instructed by an Authority employee to relieve Wayne Nagle, another worker placed by Kelly Labor, at a "metering station" where he was to remove sewage samples from a pit every half hour. ***Id.*** at 1346-47. When a third Kelly Labor worker reported for work the following day, he found both Plaintiff and Nagle dead at the bottom of the pit, presumably from noxious fumes. ***Id.*** at 1347.

In affirming the trial court's order granting summary judgment to the Authority under the "borrowed employee" doctrine, the ***English*** panel rejected Plaintiff's argument that the fact Kelly Labor employee "Nagle was supposed to instruct [Plaintiff] on the procedure for sampling sewage at the pit" could be "considered an exercise of Kelly Labor's supervisory power over" Plaintiff. ***English***, 428 A.2d at 1349 n.3. Rather, the panel opined:

> Nagle was not a Kelly Labor supervisor; he had the exact same status as did [Plaintiff]. While Nagle was acting under the direction of the Authority, he was, as was [Plaintiff], an employee of the Authority and not of Kelly Labor. Such instructions as the Authority contemplated Nagle giving [Plaintiff] must therefore be viewed as instructions of a fellow Authority employee. Consequently, we find no merit to the contention of [Plaintiff] that "it was never contemplated that any of (the Authority's) employees would be at the job site[;]" in fact the Authority did

- 13 -

> contemplate leaving Nagle at the job site to instruct [Plaintiff] on how to remove the sewage.

***Id.*** (record citations omitted).

Accordingly, the other employees who had been placed at Daron by Express stood in the same position at Nagle — when training Mason, they were acting under Daron's authority, and, thus, were employees of Daron and not Express. In fact, there was **not** an Express supervisor present at Daron who directed and controlled the employees placed at the company. Although Mason testified that he "believe[d Express] visited" the jobsite, he conceded that he never saw anyone from Express, but rather, he "just heard they were in the building." ***See*** Mason's Deposition at 41, 43. Kapuscinski, Daron's operations manager at the time, explained that Express "would stop by[,] at the most, twice a year, once during the holidays" and another time to inquire if they could do anything for Daron. ***See*** Kapuscinski's Deposition at 47. He described the visits as "a sales call."[8] ***Id. Compare Gardner***, 189 A.3d at 445 (temporary employment agency that placed employee in defendant company provided employees transportation to defendant company, with agency supervisor; agency supervisor told employees where they would be

_____

[8] We note that Mason's testimony concerning these "visits" was dubious. He admitted he was not "sure" Express visited while he worked for Daron, he did not have "[a]ny idea how many times they may have visited[,]" and he had no idea who "from Express . . . may have visited[.]" ***See*** Mason's Deposition at 41-42. Therefore, his testimony concerning the "visits" does not contradict Kapuscinski's to the extent that it raises a genuine issue of fact.

working each day; and agency supervisor was available to employees and "conducted walk-throughs throughout the workday").

Lastly, we note that while Express had the sole authority to hire and fire Mason, and paid his salary, those facts are not dispositive. **See Burrell**, 222 at 1139-40. Rather, the focus is on whether Daron had the right to control "not only . . . the work to be done but also . . . the manner of performing it[,]" regardless of whether Daron "actually exercised" that control. **See id.** at 1140 (citation & emphasis omitted). Kapuscinski testified that when Daron needed an employee, it would call Express to request an employee for a particular shift. **See** Kapuscinski's Deposition at 42. Although Daron had no influence as to whom Express sent to fill the job, Daron had the ability to tell Express **not to send an employee back** to the jobsite. **Id.** at 35, 58. **See also** Kiesling's Deposition at 46-47, 55. Thus, Daron could effectively "fire" an employee provided by Express. Moreover, although Express paid the employees it placed at Daron, including Mason, Daron reported to Express the number of hours the employee worked and the Express "invoice[d]" Daron for the salary amount. **See id.** at 42. Keisling also testified that a temporary employee placed by Express could transition to a full-time Daron employee after 700 hours of work. **Id.** at 42-43.

Mason's reliance on the decision of the Pennsylvania Supreme Court in **Mature v. Angelo**, 97 A.2d 59 (Pa. 1953), and this Court in **Shamis v. Moon**, 81 A.3d 962 (Pa. Super. 2013), is misplaced.

The facts in **Mature** are readily distinguishable. In that case, Plaintiff, an employee of a general contractor, was injured when the employee of Defendant, a subcontractor, was operating a front-loader and struck him on the jobsite. **See Mature**, 97 A.2d at 62. The general contractor had rented the front-loader, and its skilled operator, from Defendant. **See id.** Plaintiff later sued Defendant and the jury returned a verdict in his favor. **See id.** On appeal, Defendant argued that his employee was actually a "borrowed employee" of the general contractor at the time of the accident, so that Defendant could not be held liable for his employee's negligence. **See id.** The Supreme Court rejected this claim, opining:

> [T]his is an ordinary, typical case of the **renting of a machine with an operator specially skilled for the purpose from one who is in the business of renting out such machines and operators**, where neither the person renting such machine and operator, nor his own employes, are competent to run such a machine and merely direct the operator concerning the work to be done, — not the manner of performing it. . . .

**Id.**

The case before us does not involve a general contractor who rented a machine and its skilled operator from a subcontractor. Rather, Daron requested an employee from Express, and Daron trained that employee to perform a specific job at its facility. Thus, the decision in **Mature** has no bearing on this case.

In **Shamis**, a panel of this Court vacated an order granting summary judgment in favor of Defendant/company, concluding there was a genuine issue of material fact regarding whether Plaintiff "ever passe[d] under

- 16 -

[Defendant's] right of control with regard not only to the work to be done but also to the manner of performing it." ***Shamis***, 81 A.3d at 973 (citation & quotation marks omitted). However, the decision is distinguishable for several reasons.

First, the panel recognized that the facts of that case invoked "statutory employer" immunity, although Defendant did not request summary judgment on that basis, and, therefore, the record was undeveloped in that regard. ***See Shamis***, 81 A.3d at 907-71. Indeed, Plaintiff was a laborer employed by a demolition subcontractor, and Defendant was the demolition contractor. ***See id.*** at 964. Such subcontractor/general contractor relationships generally fall under ***McDonald***'s "statutory employer" test. ***See McDonald***, 153 A. at 426.

Second, the panel focused on the several facts which contradicted the trial court's determination that the contractor "had the power to control [Plaintiff's] work and exercised that power" at the time of Plaintiff's accident. ***See Shamis***, 81 A.3d at 971 (record citation omitted). Plaintiff's workers' compensation documents, which were part of the certified record, included declarations that, on the date of the accident, Plaintiff was a full-time employee of the subcontractor, and not employed by any other company. ***See id.*** at 972. Also, Plaintiff was a "highly skilled employee who needed little direction on the job." ***Id.*** Lastly, the contract executed by the subcontractor and contractor provided that the subcontractor would "furnish all supervision and labor" for the job, but "work under the general direction" of the contractor, who had final approval. ***See id.*** at 972-73 (record citations omitted).

Therefore, the **Shamis** Court observed the record included evidence that Plaintiff was never even "loaned" to the contractor, and that the subcontractor did not intend to pass to contractor the right to control Plaintiff's work. **See id.** at 973 (citation & emphasis omitted).

Conversely, in the present case, Express is **not** a subcontractor of Daron. Rather, it is a temporary employment agency that provides employees to companies, similar to **Burrell**. Mason was not a highly skilled employee and was trained by Daron how to perform the assembly line inspector job. Further, the record contains no documentation relating to Mason's workers' compensation claim — thus, there is no affirmative declaration in the record, as in **Shamis**, stating that Mason was Express' full-time employee. Rather, like the Court in **Burrell**, we conclude the record supports the trial court's determination that Daron had the authority to control Mason's work and the manner in which he completed it.

Accordingly, we conclude the trial court did not err or abuse its discretion when it determined, as a matter of law, that Mason was Daron's "borrowed employee" at the time of his accident, and that, therefore, Daron is immune from civil liability under the WCA.

Order affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/21/2023